ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ (147029)
LAURIE L. LARGENT (153493)
ROBERT R. HENSSLER JR. (216165)
MATTHEW I. ALPERT (238024)
KEVIN S. SCIARANI (301411)
EVELYN SANCHEZ GONZALEZ (360232)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
ksciarani@rgrdlaw.com
egonzalez@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DOUGLAS ELLIOTT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EDISON INTERNATIONAL, SOUTHERN CALIFORNIA EDISON COMPANY, PEDRO J. PIZARRO, and MARIA RIGATTI,<br><br>Defendants. | Case No. 2:25-cv-01383-ODW (DFMx)<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

**TABLE OF CONTENTS**

**Page**


I. OVERVIEW OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 2

III. THE PARTIES .......... 3

A. Lead Plaintiffs .......... 3

B. Defendants .......... 3

IV. DEFENDANTS' FRAUD .......... 4

A. The Company Faces Massive Liabilities for Wildfires Caused by SCE's Equipment, Even with the California Wildfire Fund in Place .......... 7

B. Defendants Misled Investors About the Effectiveness of SCE's Wildfire Mitigation and PSPS in Reducing Catastrophic Wildfire Risk .......... 9

C. Defendants' Misstatements About Reducing Catastrophic Wildfire Risk and Loss Liability Were Material to Investors and Other Stakeholders .......... 13

D. Defendants Misled Investors About SCE's Wildfire Risk Reduction Success by Omitting the Serious Deficiencies in Its WMP and PSPS Program for Transmission Lines .......... 15

E. Defendants Failed to Disclose Additional Risks Posed by Other Deficiencies in SCE's WMP .......... 20

F. The Eaton and Hurst Wildfires Expose Defendants' Deficient Wildfire Risk Reduction Efforts .......... 22

G. Defendants Downplay SCE's Responsibility for the Eaton Fire .......... 25

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .......... 30

A. Defendants' 2021 Statements .......... 30

B. Defendants' 2022 Statements .......... 33

C. Defendants' 2023 Statements .......... 35

D. Defendants' 2024 Statements .......... 37

VI. ADDITIONAL SCIENTER ALLEGATIONS .......... 42

A. Defendants' Knowledge and Access to Information Supports Scienter .......... 42




4930-7586-1578.v1

**Page**

B. The Alleged Fraud Concerned Edison's Core Operations ................. 46

C. Defendants Were Motivated to Mislead Investors About Reducing Edison's Catastrophic Wildfire Risk to Improve Borrowing Costs ................................................................. 48

D. The Temporal Proximity Between Defendants' Misrepresentations and the Revelation of Information Undermining Those Representations .............................................. 51

VII. LOSS CAUSATION ................................................................................ 51

VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD ON THE MARKET DOCTRINE.......................................... 65

IX. CLASS ACTION ALLEGATIONS ......................................................... 66

X. CAUSES OF ACTION ............................................................................. 67

PRAYER FOR RELIEF ................................................................................... 70

JURY DEMAND............................................................................................... 71

Lead Plaintiffs Hawaii Sheet Metal Workers Pension Fund, Hawaii Sheet Metal Workers Health and Welfare Trust Fund, and Hawaii Sheet Metal Workers Annuity Profit Sharing Fund ("Lead Plaintiffs" or the "Hawaii Sheet Metal Workers Funds") allege the following based on personal knowledge as to themselves and their own acts, and information and belief as to all other matters.[1]

## I. OVERVIEW OF THE ACTION

1. This is a securities fraud class action brought on behalf of purchasers of Edison common stock between February 25, 2021 through April 29, 2025, inclusive (the "Class Period"), against Edison; SCE; Pedro J. Pizarro, Edison's Chief Executive Officer ("CEO"); and Maria Rigatti, Edison's Chief Financial Officer ("CFO") (collectively, "Defendants"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2. This case arises from Defendants' materially misleading statements and omissions about the extent to which Edison and SCE, Edison's utility subsidiary, had reduced the risk of losses from catastrophic wildfires. Defendants repeatedly touted SCE's Public Safety Power Shutoff ("PSPS") program, combined with physical mitigation measures like grid hardening and vegetation management, as dramatically reducing wildfire risk – claiming a 55%-65% reduction in 2021, rising to over 85%-90% by July 2024, compared to pre-2018 levels. However, these assurances were misleading. Defendants failed to disclose critical deficiencies in SCE's wildfire

[1] Lead Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to, a review and analysis of: (a) Edison International's ("Edison") and Southern California Edison Company's ("SCE," and collectively with Edison, the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of Edison's conference calls with investors and analysts; (c) releases and media reports issued about and disseminated by the Company; (d) analyst reports issued about the Company; (e) interviews of potential percipient witnesses; (f) other public information and data regarding the Company; and (g) documents cited herein. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

mitigation plans and PSPS program, including its inability to safely execute PSPS on key transmission lines in high-risk areas, delays in system upgrades, and outdated safety procedures for idle lines. Moreover, the Company's internal wildfire risk models did not fully account for foreseeable extreme weather events, and the Company submitted incomplete data to third-party risk analysts, which caused its reported risk reductions to be inflated. A *Los Angeles Times* investigation later revealed that SCE was structurally unable to safely implement PSPS on multiple key transmission lines without risking broader system failures – undermining Defendants' repeated claims about SCE's PSPS program's effectiveness as a last-resort wildfire prevention measure.

3. The truth began to emerge on January 7, 2025, when the Eaton fire ignited under SCE's transmission equipment in Eaton Canyon in the San Gabriel Mountains during an extreme windstorm. As details continued to surface about the role of SCE's transmission equipment in igniting the fire, and the Company's potential liability exposure, Edison's stock price declined sharply through a series of partial disclosures. Then, on April 29, 2025, Defendants were forced to admit that it was probable the Company would incur material losses stemming from the ignition of the Eaton fire due to the failure to de-energize SCE's transmission lines located near Eaton Canyon. As these truths about SCE's wildfire risk management failures came to light, investors suffered significant losses from the rapid decline in Edison's stock price, which had been artificially inflated by Defendants' prior misrepresentations. Since the Eaton fire began, Edison has lost approximately one-third of its market value, as the blaze destroyed more than 9,000 structures and caused estimated damages ranging from $7 billion to $17.5 billion.

## II. JURISDICTION AND VENUE

4. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). This Court has jurisdiction over the

subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

5. Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)-(c) and §27 of the Exchange Act and because at all relevant times Edison maintained its corporate headquarters in this District. Additionally, many of the acts charged herein, including the preparation and dissemination of materially misleading information, occurred in substantial part in this District.

6. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce of the United States, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

### A. Lead Plaintiffs

7. The Hawaii Sheet Metal Workers Funds are related Taft-Hartley employee benefit plans that provide retirement and other benefits for members of the Hawaii Sheet Metal Workers Union and their beneficiaries. The Hawaii Sheet Metal Workers Funds purchased Edison common stock during the Class Period as set forth in the Certification previously filed in this action, and were damaged thereby. ECF 26-2.

### B. Defendants

8. Edison is the parent holding company of the public utility company SCE. Edison is incorporated under the laws of the state of California and is headquartered in Rosemead, California. Edison common stock trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "EIX."

9. SCE operates as a subsidiary of Edison. SCE is one of the nation's largest electric utilities, delivering power to 15 million people in 50,000 square miles across central, coastal, and Southern California. As reported in Edison's Annual Report on Form 10-K filed with the SEC for fiscal year ("FY") 2023, SCE was

Edison's only profitable business, bringing in $2.135 billion in core earnings, while Edison's other reporting segment, "Edison International Parent and Other," brought in core earnings losses of $310 million.[2]

10. Defendant Pedro J. Pizarro ("Pizarro") was, at all relevant times, Edison's President and CEO, and a member of Edison's Board of Directors and SCE's Board of Directors.

11. Defendant Maria Rigatti ("Rigatti") was, at all relevant times, Edison's Executive Vice President and CFO.

12. Defendants Pizarro and Rigatti are collectively referred to herein as the "Individual Defendants." The Individual Defendants, Edison, and SCE are collectively referred to as "Defendants."

13. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's quarterly reports, shareholder letters, press releases and other public statements, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew that the positive representations being made were then materially false.

## IV. DEFENDANTS' FRAUD

14. During the Class Period, Defendants misled investors about the extent to which SCE reduced the risk of massive financial losses from catastrophic wildfires

---

[2] As used herein, the letter "Q" will denote the quarter a given fiscal year (*e.g.*, Q1 2023 means the first fiscal quarter of FY 2023).

and misled investors about the effectiveness of SCE's PSPS Program. Defendants repeatedly touted SCE's PSPS system as a critical part of the Company's wildfire mitigation strategy, and that the PSPS, coupled with SCE's physical mitigation efforts – such as grid hardening and vegetation management – were successfully, and dramatically, reducing the Company's exposure to significant financial losses from catastrophic wildfires. From November 2021 to October 2024, Defendants told investors that the Company's mitigation efforts, and PSPS, had significantly reduced the probability of losses from catastrophic wildfires – starting at a 55%-65% risk reduction in November 2021 to a 85%-90%+ risk reduction by July 2024, in comparison to pre-2018 levels, an era marred by multiple devastating wildfires started by SCE and its peer utility, Pacific Gas & Electric's ("PG&E"). But Defendants concealed from investors that deficiencies in SCE's wildfire mitigation plans ("WMP") and related PSPS program left the Company exposed to significant wildfire risk. Specifically: (a) SCE was unable to safely and effectively use PSPS on certain transmission lines running through the highest wildfire threat districts abutting populated areas (including the Eaton Canyon area); (b) Defendants failed to timely complete authorized transmission system upgrades to address SCE's inability to implement PSPS on certain transmission lines; (c) limitations on using PSPS for transmission lines created significant deficiencies in SCE's WMPs because it did not have approvals to harden those lines with covered conductors, leaving it overly reliant on PSPS for transmission wildfire risk reduction; (d) Defendants knew of the risk and dangers posed by induction or re-energization of idle transmission lines, some of which were grounded under safety procedures in place over half a century ago; (e) the Company's internal wildfire risk models failed to "consider rare but foreseeable and significant risks" of extreme wind events; and (f) Defendants misleadingly overstated SCE's wildfire risk reduction by failing to provide all information about SCE's transmission infrastructure's wildfire risk and PSPS limitations for use in Moody's RMS North America Wildfire HD Models, thereby inflating the risk reduction

percentages Defendants publicly reported.[3] These substantial known deficiencies in SCE's wildfire risk management render Defendants' statements on catastrophic wildfire risk reductions false and misleading.

15. The false and misleading nature of Defendants' statements were first revealed on January 7, 2025, when SCE's overhead transmission lines ignited vegetation in Eaton Canyon starting the Eaton fire and later that evening, the Hurst fire in nearby Sylmar, CA. Both wildfires ignited during an extreme "Red Flag" – Particularly Dangerous Situation ("PDS") windstorm. Although Defendants claimed to have taken extensive steps to reduce wildfire risk – including having a PSPS program to prevent catastrophic wildfires during Red Flag extreme weather – and receiving at least four days' advance warning to prepare for a PDS, SCE failed to de-energize transmission lines in the high-risk Eaton Canyon area, which ultimately sparked the fire, potentially by re-energizing a nearby improperly grounded idle transmission line.

16. As uncovered by a *Los Angeles Times* investigation, SCE could not safely and effectively implement PSPS, an effective last-resort safety measure to mitigate the risk of catastrophic wildfires during extreme weather events, to de-energize three of the four transmission lines running through Eaton Canyon and two transmission lines near Sylmar, because doing so could jeopardize the reliability of the transmission system as a whole. The California Independent System Operator ("CAISO"), to which SCE voluntarily ceded operational control of the transmission grid in 1998, had previously warned SCE to exclude these transmission lines from PSPS events until it made the needed improvements to the transmission system, which it had not completed despite receiving this warning in 2022. Moreover, even the

[3] Moody's RMS, a subsidiary of Moody's Corporation, is a risk management company that develops risk management models and analytics, including the Moody's RMS North America Wildfire High Definition ("HD") Models ("Moody's RMS model"), which it describes as a suite of wildfire risk modeling tools that can be used by companies to quantify the impact of mitigation efforts on wildfire risk and potential wildfire losses.

PSPS plans for the local distribution lines were not calibrated to account for the rare but foreseeable extreme Red Flag wind event.

### A. The Company Faces Massive Liabilities for Wildfires Caused by SCE's Equipment, Even with the California Wildfire Fund in Place

17. According to California Department of Forestry and Fire Protection ("Cal Fire"), from 2007-2018, public utility equipment and power wires were deemed responsible for 6 of the top 20 most destructive California wildfires, and were responsible for the destruction of more than 25,000 structures – and for over 1.7 million burned acres and the loss of 96 lives. Once Cal Fire confirms Edison's responsibility, the Eaton fire will join this ignominious list as the second most destructive fire in California history.

18. Historically, public utilities compensated fire victims through the legal process. California's inverse condemnation law allows fire victims to hold public utilities strictly liable for damages caused by fires started by their equipment. After these actions were resolved, electric utilities, if they were found to have operated prudently, could apply to the California Public Utilities Commission ("CPUC") to pass the costs of liability payouts onto its customers. Otherwise, the utility's shareholders bear the costs of settling fire victim claims.

19. PG&E's January 2019 bankruptcy upended this system for wildfire damage liability. PG&E's bankruptcy involved tens of billions of dollars in potential liabilities related to the 2017 and 2018 wildfires, including the infamous November 2018 Camp fire in Northern California's Butte County. At the same time, liabilities stemming from the Thomas (December 2017) and Woolsey (November 2018) fires that SCE equipment ignited in Santa Barbara County and Malibu, respectively, were straining Edison's balance sheet. The Thomas fire was ignited when two overhead distribution wires slapped into each other during high winds, generating an electric arc (*i.e.*, an electric spark jumping between two conductors) which rained molten metal on

the dry underbrush. The Woolsey fire started after a loose non-energized transmission down guy wire arced after it contacted energized conductors resulting in falling hot metal. But unlike PG&E, Edison was able to resolve its claims without resorting to bankruptcy. Edison did not emerge unscathed, however, as it was forced to issue $1.25 billion in equity to prevent additional credit rating downgrades resulting from its debt issuances used to pay for wildfire claims.

20. According to Edison's Annual Report on Form 10-K filed with the SEC for FY 2024, by the end of 2024, Edison would pay out $9.9 billion to resolve legal claims relating to the Thomas and Woolsey fires.

21. In response to the PG&E bankruptcy, and the expectation of increased climate change-fueled wildfire conditions impacting all California electric utilities, in July 2019, Governor Gavin Newsom signed into law assembly bill ("AB") 1054 and AB 111 (together, the "Wildfire Legislation") to update the utility fire insurance and safety regime. These laws require utilities to take steps to improve wildfire safety in exchange for financial protection from wildlife-related losses. The Wildfire Legislation also streamlined the process for compensating fire victims through the creation of a $21 billion utility/customer funded insurance fund (the "California Wildfire Fund" or the "Fund") to allow for the expedited payment of claims for damages caused by utility equipment ignited fires.

22. The California Wildfire Fund provides significant support to California utility companies when their equipment cause wildfires. Under the Fund framework, utilities are required to self-insure the first $1 billion in wildfire-related losses before they are permitted to tap the Fund. If the utility is later found to be imprudent, meaning it failed to take all the reasonable steps that were expected – such as clearing vegetation, hardening power lines, and shutting off power during red flag conditions – it would be required to reimburse the California Wildfire Fund. Edison, based on the size of its rate base, could be liable for up to $3.9 billion (as of 2024) to reimburse the Fund, although there would be no liability cap if the utility is found to have acted with

"conscious or willful disregard of the rights and safety of others." So while the Wildfire Legislation provides a cap on liability, utilities still face significant liability risks in the event they are not prudent, act with willful disregard for safety, or cause fires that exceed the value of the California Wildfire Fund, which terminates after its funds are exhausted.

23. In exchange, the Wildfire Legislation requires utilities "to invest in safety and improve safety culture to limit wildfire risks and reduce costs" (AB 1054, §2(f)) and "construct, maintain, and operate its electrical lines and equipment in a manner that will minimize the risk of wildfire posed by those electrical lines and equipment." Cal. Pub. Utils. Code §8387(a). Utilities may request the CPUC to authorize rate increases to pass on the costs of reasonable safety upgrades to rate payers, removing a financial disincentive to taking the needed action. The legislation further requires utilities to tie executive compensation to safety performance and to ensure public safety and utility financial stability.

### B. Defendants Misled Investors About the Effectiveness of SCE's Wildfire Mitigation and PSPS in Reducing Catastrophic Wildfire Risk

24. Electric utilities document their compliance with the directives of the Wildfire Legislation in a WMP, which is submitted for approval by the California Office of Energy Infrastructure Safety ("OEIS"). The utility may then apply for an annual safety certification by demonstrating, among other things, its implementation of the approved WMP. The safety certification provides the utility a presumption of prudence so it can immediately access the California Wildfire Fund without needing to complete a catastrophic wildfire proceeding before the CPUC.

25. The purpose of the WMP is for the electric corporation to affirm that it "construct[s], maintain[s], and operate[s] its electrical lines and equipment in a manner that will minimize the risk of catastrophic wildfire posed by those electrical lines and equipment." Cal. Pub. Utils. Code §8386(a). WMPs must be

"comprehensive," and contain detailed plans with respect to wildfire mitigation and PSPS, and contain numerous objective facts, such as "metrics the electrical corporation plans to use to evaluate the plan's performance and the assumptions that underlie the use of those metrics"; and "[p]rotocols for disabling reclosers [an automatic high voltage circuit breakers] and deenergizing portions of the electrical distribution system." Cal. Pub. Utils. Code §8386(c)(4) & (6).

26. SCE's WMP served as the purported objective proof of its risk mitigation successes throughout the Class Period. During earnings calls and through other public statements, Defendants repeatedly highlighted to investors the significant catastrophic wildfire risk reduction SCE had achieved. For example, at the beginning of the Class Period, Pizarro assured investors that Defendants' execution of SCE's wildfire mitigation strategy "has reduced the risk of wildfires associated with utility infrastructure despite a record-setting California wildfire season last year," and "[f]or the second consecutive year, we do not believe damages from any wildfire alleged to be caused by SCE equipment will exceed insurance." And on October 29, 2024 – just two months before the Eaton fire – Defendants reaffirmed that their mitigation efforts had reduced catastrophic wildfire risk by more than 85%-90%, and further cited additional risk reductions resulting from State and local investments in firefighting resources.

27. During the Class Period, Defendants spoke about specific "differentiated and substantial" steps SCE took to reduce wildfire risk, including:

(a) "hardening" power infrastructure though "covered conductor[s]," by which exposed electric conducting wires are covered with an insulating material to prevent electric arcs and sparks, and installing other fire protective materials on its equipment;

(b) trimming and removing vegetation near power lines in high fire risk areas ("HFRA");

(c) regularly inspecting equipment in HFRAs;

(d) installing localized weather stations and installing HD cameras to quickly identify fire conditions and new fires;

(e) using advanced technologies, such as early fault detection, fault current limiters and artificial intelligence;

(f) partnering with local fire agencies to support aerial firefighting crews; and

(g) proactive use of PSPS to de-energize power lines as a last resort.

28. By November 2024, Defendants touted that SCE had installed 6,100 miles of covered conductors on its distribution grid, conducted 2 million trims and removals of vegetation in HFRAs, conducted a million HFRA safety inspections, and installed 1,770 weather stations and 200 cameras. Defendants claimed SCE had completed nearly 90% of HFRA mitigation actions by the end of 2024. In sum, Defendants assured investors that SCE had implemented multiple layers of safety measures to reduce the risk of catastrophic wildfires, which they quantified as an 85%-90%+ reduction in risk of catastrophic wildfires. The "cornerstone" of these measures were the covered conductors to prevent electric arcs between conductors. And even if those lines did spark, the Company represented to investors, regulators, and the public that it regularly cleared the nearby vegetation and fireproofed other equipment. Rapid response was the next layer of protection – even if a fire was ignited, the cameras and other monitoring equipment would allow for quick identification of a fire, so that state and utility investments in firefighting capabilities could be called upon to put out the fire before it grew out of control. As the failsafe, Defendants claimed the Company had updated its weather and grid monitoring technology to better target PSPS when extreme weather and fuel conditions warranted it.

29. The CPUC explicitly authorized SCE's PSPS program in 2012. In the years that followed the 2017-2018 wildfire seasons, the media and politicians criticized PG&E and SCE for their overreliance on PSPS to prevent fires. Power

shutoffs provide the highest level of fire protection, but impose significant hardship on customers, in particular those who rely on electricity for their health and safety. To combat excessive PSPS, in June 2021, the CPUC issued a final decision that reduced future authorized revenue for electricity sales resulting from new PSPS events until SCE improved its PSPS program. Thus, SCE's WMP focused on its goal to reduce the number and scope of PSPS events through the physical mitigation steps outlined in its WMP. Indeed, by 2023, Defendants claimed PSPS only provided ~10% of the 85% wildfire risk reduction achieved by SCE.

30. SCE's PSPS program weighs wildfire risk against the risks and harms caused by a PSPS event and is calibrated to shut off power once wildfire risk exceeds the PSPS risk. For example, according to the 2023-2025 WMP, when elevated fire conditions are present, the PSPS threshold for uncovered lines was 31 mph sustained winds and 46 mph gusts, but given the purported lower wildfire risk for covered lines, SCE set a higher PSPS threshold of 40 mph sustained winds with 58 mph gusts. Likewise, due to increased wildfire risk caused by large scale weather events, the PSPS thresholds may be lowered, as, for example, flying debris stirred up by high winds could damage the hardened wires and spread fires faster than firefighting resources could be deployed. So while widespread use of PSPS was discouraged, Defendants confirmed to the public that SCE's protocols would still trigger a PSPS event during the most dangerous wind conditions, making it still a critical tool for wildfire mitigation.

31. Touting SCE's mitigation efforts, Defendants boasted that SCE had not caused any fires resulting in structure loss since 2018, attributing its success to its fire mitigation efforts. Defendants also boasted about SCE's PSPS program by publicly reporting on the number of instances where PSPS events had potentially prevented wildfires. The message was clear – other than an unforeseen event or extraordinary bad luck – the predictable kind of devastating utility-caused wildfires in SCE's service area were a thing of the past.

32. Indeed, on July 27, 2023, when asked what she viewed as the biggest risk to achieving Edison's long-term 5%-7% growth outlook through 2028, defendant Rigatti, Edison's CFO, did not even mention wildfire risk. Instead, she stated that the Company had "worked through a bunch of headwinds that we are dealing with in the '21 to '25 period, and we've managed through those," thereby signaling to investors that catastrophic wildfire risk – long considered a major overhang since 2018 – was no longer a significant concern.

### C. Defendants' Misstatements About Reducing Catastrophic Wildfire Risk and Loss Liability Were Material to Investors and Other Stakeholders

33. Because of the near limitless liability posed to utility companies from catastrophic wildfires, investors and securities analysts were keenly attuned to Defendants' Class-Period representations on the steps SCE had taken to reduce its risk of starting future catastrophic wildfires.

34. Throughout the Class Period, financial analysts regularly published reports about the Company and its financial prospects. In particular, the financial analysts' reports repeatedly focused on Defendants' statements about what actions the Company had purportedly taken to reduce the probability of losses from catastrophic wildfires and tracked Defendants' representations on the steady reduction in catastrophic wildfire risk to upgrade their recommendations and price targets. The following excerpts from analyst reports are illustrative of the financial importance that analysts placed on Defendants' statements:

(a) On April 18, 2022, UBS Securities LLC ("UBS") reported that it raised its price target and noted: "Wildfire Mitigation Efforts Taking Hold [– Edison] estimates grid hardening investment and de-energization criteria (PSPS) have reduced the potential for a $1B or greater fire by 65% versus pre-2018 levels to 2.6%."

(b) On January 3, 2023, UBS issued a report titled "Moving to Buy from Neutral Raising Price Target to $75 from $69." UBS wrote: "We are raising our

price target to $75 from $69 to reflect a 5% reduction in wildfire liability risk and 4% for an increase in the Utility group average P/E multiple." To support its investment thesis, UBS pointed to the Wildfire Legislation and Edison's "hardening of 4,300 miles of overhead lines (10,000 total) by the end of 2022 and improved use of PSPS." UBS further noted that Edison "has not had a major fire in its territory since the Woolsey fire stated in November 2018."

(c) In February 2023, Evercore ISI reported: "Management now estimates that its wildfire mitigation and PSPS have reduced probability of losses from catastrophic wildfires by 75%-80% from 65-70% previously."

(d) On February 5, 2024, UBS again raised its price target and noted:

Q: What has decreased the wildfire liability risk?

> Grid hardening in the high fire threat district primarily through the installation of covered conductors and use of pre-emptive power shut-offs (PSPS). The company has covered 58% of high-fire threat district overhead wire with covered conductor since 2018 which has had no ignitions. Including PSPS and covered conductor, [Edison] calculates a[n] 85% risk reduction in a major fire since 2018.

(e) In May 2024, Evercore ISI reported: "[Edison] continues to estimate that its wildfire mitigation and PSPS have reduced the probability of losses from catastrophic wildfires by 85%-88% since pre-2018."

35. Defendants' misstatements on Edison's fire mitigation successes allowed Edison to lower its insurance premiums in 2022, and improve its credit rating outlook and borrowing rates.

36. On July 29, 2022, Evercore ISI reported: "Moody's and Fitch recently affirmed [Edison's] credit ratings of Baa3 and BBB-, respectively, and raised their outlooks to Positive from Stable. Both of these positive outlook changes were driven by recognition of the utilities' progress addressing wildfire risk, combined with the constructed AB 1054 framework." In January 2024, Fitch Ratings, Inc. ("Fitch"),

citing Edison's purported continued progress in preventing future wildfires, gave Edison a stable outlook and forecasted: "SCE's 2023-2026 credit metrics to improve significantly."

37. Defendants' statements had the intended effect to allay investors' fears of investing in a wildfire prone utility company and allowed Edison to profit from short-term rating improvements gains in exchange for undisclosed longer term risk. On March 28, 2024, Barclays Bank PLC declared that it was "[t]ime to [r]eassess US [w]ildfire [r]isk [p]rofiles." Barclays's view was "premised on operational risk reduction" which "[Edison] has been proving this out via covered conductor deployment, PSPS and EPSS [enhanced power line safety settings to quickly shut off power]."

### D. Defendants Misled Investors About SCE's Wildfire Risk Reduction Success by Omitting the Serious Deficiencies in Its WMP and PSPS Program for Transmission Lines

38. In contrast to Defendants' rosy descriptions of SCE's risk management systems, Defendants failed to disclose the risks posed by SCE's transmission system.

39. SCE's power lines fall into two broad categories – transmission lines and distribution lines. Transmission lines generally refer to long distance, high-voltage (generally 115 kilovolts or higher) bulk energy transmission to wholesale customers. Transmission power lines are typically supported by tall lattice towers made of metal. In contrast, distribution lines are generally lower voltage power lines that bring power to retail customers' homes, businesses, and other structures. These power lines are typically supported on wooden poles or buried underground for aesthetic reasons.

40. A crucial distinction between the operation of transmission and distribution lines results from SCE's interconnection with the regional power grid, allowing power to be balanced between where it is generated and where it is needed. To facilitate this interconnection, in 1998, the Company ceded operational control to CAISO, the non-profit independent grid operator tasked with ensuring the reliability

of California's transmission system by coordinating and monitoring California's electric grid. While operational safety and reliability of the power grid rests with CAISO, the Company retains full ownership and responsibility for the safety of its transmission infrastructure, including decisions to institute a PSPS.

41. As California's primary grid operator, CAISO performs rigorous studies and prepares transmission plans identifying necessary transmission upgrades for reliable grid operation. CAISO's transmission plans incorporate wildfire risk considerations, including PSPS impacts. In 2021-2022, CAISO conducted a study that assessed SCE's transmission equipment, including equipment in the Eaton Canyon area and analyzed PSPS scenarios. The study results were included in CAISO's 2021-2022 Transmission Plan, approved on March 17, 2022 (the "Transmission Plan").

42. CAISO's study "assess[ed the] impact of various Public Safety Power Shutoffs (PSPS) scenarios in the SCE . . . area." Specifically, CAISO "conducted studies to assess the potential risks of de-energizing ISO-controlled facilities in the High Fire Risk Area's (HFRA) for SCE . . . should it become necessary for PSPS or wildfire events." The study found that preemptively cutting power to SCE's transmission lines for a PSPS event, including some running through Eaton Canyon and Sylmar, could cause a direct load impact of 900 to 1,000 megawatts. This meant that if SCE shut off power to the transmission lines studied by CAISO, including lines in the Eaton Canyon area, during a wildfire risk event, not only would SCE cut power to hundreds of thousands of customers, the PSPS events would trigger a second problem: the remaining Los Angeles electrical infrastructure would become dangerously overloaded as power flows would redistribute across the grid, creating a power-overload risk. In other words, PSPS events on the Eaton Canyon and/or Sylmar power lines would force 900-1,000 megawatts of electricity to reroute through other transmission lines that stayed on, causing them to potentially overheat, sag, or fail – which could spark the very wildfires SCE's PSPS program was designed to

prevent, or result in widespread power outages beyond the affected transmission circuits.

43. CAISO's Transmission Plan concluded that certain "high-impact critical facilities," including SCE's transmission equipment near Eaton Canyon and Sylmar, should be "excluded from the scope of similar future PSPS or wildfire scenarios." CAISO concluded that it would coordinate with SCE so that "the utilit[y's] wildfire mitigation plans [are] able to exclude the high-impact facilities identified from the future PSPS events."

44. All of the transmission lines CAISO targeted for PSPS exclusion ran through Eaton Canyon or the Sylmar region. CAISO classified 5 of Edison's 38 transmission lines running through Tier 2 and Tier 3 high fire threat districts as "Critical Facilities" that should be excluded from PSPS: Mesa-Vincent No. 1 or No. 2 230 kV, Eagle Rock-Sylmar 230 kV, or Goodrich-Gould and Gould-Sylmar 230 kV. The Mesa-Vincent Nos. 1 and 2 and Goodrich-Gould transmission lines run through Eaton Canyon where the Eaton fire was ignited. The Eagle Rock-Sylmar and Gould-Sylmar lines run through the area where the Hurst fire was ignited.

45. To mitigate this safety and reliability issue, the CAISO Transmission Plan approved a project for SCE to upgrade the line rating on another SCE transmission line, the Laguna Bell-Mesa, to mitigate the load impacts from a PSPS at the critical facilities, including those near Eaton Canyon. Although SCE planned to complete the Laguna Bell-Mesa No. 1 "reconductoring" by the Q4 2023, the project was not completed prior to the Eaton and Hurst wildfires, even though it was a critical mitigation measure that could have enabled a PSPS during severe weather conditions without an overload risk.

46. Despite CAISO's warnings to exclude PSPS on the transmission lines running through the Eaton Canyon and Sylmar areas, and the fact that SCE had not completed the CAISO-approved reconductoring project, SCE failed to implement other available mitigation measures: it did not harden any of its overhead transmission

lines prior to the Eaton and Hurst fires or bury the transmission lines underground, claiming that covered conductors (which are inapplicable to transmission lines) provided a better cost-benefit ratio. SCE's WMP justified its more lackadaisical attitude toward transmission lines by stating "transmission lines generally have a lower risk of ignition than its overhead distribution lines" due to taller structures and greater space between phases (*i.e.*, wires), and that covering conductors for transmission lines had not been approved for use. During the Class Period, SCE's wildfire mitigation for its Eaton Canyon and Sylmar transmission lines was essentially limited to inspections and vegetation management.

47. Unlike the rest of SCE's service area where PSPS limitations and deficiencies could be offset by grid hardening or vice versa, the Eaton Canyon and Sylmar transmission lines had limited access to either of these strategies for wildfire risk reduction. Instead, SCE's PSPS program for transmission lines traversing Eaton Canyon and Sylmar needed to account for the significant weight of the PSPS risks to the overall transmission grid stability. In particular, in contrast to SCE's efforts to limit PSPS outages to small areas, PSPS on the critical facilities in Eaton Canyon in Sylmar had the potential to cause reliability issues in widespread areas, even beyond the service area directly impacted by the PSPS. Given this extreme PSPS risk, SCE's PSPS program effectively eliminated the possibility of using PSPS in Eaton Canyon and Sylmar, even in particularly dangerous weather conditions.

48. Unlike the detailed de-energization wind speed thresholds used to trigger PSPS for distribution lines, Defendants concealed these significant PSPS limitations on SCE's ability to effectively or safely use PSPS on certain transmission lines, stating in SCE's WMP:

> SCE implemented PSPS protocols for transmission lines that traverse HFRAs. These operating protocols have been created to gauge the reliability risks associated with the pre-emptive de-energization of transmission lines including analyzing forecasted fire weather

> conditions, identifying hazardous field conditions, performing reliability risk assessments based on expected grid conditions during a PSPS event, and developing mitigation plans to address such events.

49. Although raising PSPS reliability risks, Defendants failed to disclose that, based on the CAISO study, SCE's existing PSPS protocols would fail to de-energize critical transmission facilities in Eaton Canyon and Sylmar, even in extreme weather scenarios, and that SCE failed to complete the applicable mitigation plans. But in their public disclosures, Defendants continued to represent PSPS as a viable, and critical, wildfire mitigation tool for all transmission lines.

50. To assure investors that SCE's WMP investments were "balanced by a measureable reduction in wildfire ignitions," starting in November 2021, Defendants began regularly reporting the percentage reduction of wildfire risk SCE was purportedly achieving through its mitigation efforts. To generate these percentages, the Company used Moody's RMS North American Wildfire HD Model, a model that allowed insurers and other stakeholders to assess and price wildfire risk.

51. Although Moody's RMS provided the model, SCE cherry-picked the data to be analyzed. In a case-study on SCE's use of its model released by Moody's, it noted:

> SCE supplied Moody's with data on the location of its distribution infrastructure, down to the level of individual poles; the risk profile of the region of operations, including high fire risk areas where there is abundant vegetation and prevailing weather conditions that are conducive to wildfire ignition; and ignition data reported to its regulator, the California Public Utilities Commission.

52. Moody's case study, however, did not identify any information it received from SCE on its transmission system infrastructure, including the PSPS study findings from the CAISO Transmission Plan. Thus, the Moody's RMS model failed to consider the increased wildfire risk resulting from Edison's inability to safely or

effectively use PSPS on transmission lines running through Eaton Canyon and Sylmar identified by CAISO, and/or that the PSPS protocol for those transmission lines effectively precluded the use of PSPS.

53. Without the critical inputs regarding these serious deficiencies in SCE's transmission system, Defendants' statements related to the Company's use of the Moody's RMS model, and its outputs, were materially misleading.

**E. Defendants Failed to Disclose Additional Risks Posed by Other Deficiencies in SCE's WMP**

54. In an October 31, 2024 decision, California's OEIS criticized SCE's 2025 WMP update for failing to incorporate extreme weather scenarios into planning models. Critically, in a finding which proved to be tragically prescient, the OEIS evaluation faulted Edison for "rel[ying] on wind conditions data representing the past 20 years that does not consider rare but foreseeable and significant risks. It does not evaluate the risk of extreme wind events in its service territory to prioritize its wildfire mitigations using [its multi-attribute risk score] and [integrated wildfire mitigation strategy]." OEIS clarified to *Reuters* in January 2025: "'SCE's current risk model scenarios do not do enough to predict current and future wind-related fire risks, as it doesn't consider the severe wind events and increasing weather extremes brought on by climate change' . . . ." On June 9, 2025, after the Eaton fire, *Reuters* published an article revealing that SCE's wildfire modeling just before the Eaton fire had significantly underestimated the size and impact of the Eaton Canyon Fire, projecting only 1,000 acres burned within 8 hours – while the fire ultimately scorched 14,000 acres and destroyed over 9,000 structures. According to the article, SCE's models, among other weaknesses, failed to account for wind variability inputs.

55. SCE also eschewed the safer and more costly undergrounding of wires (which pose nearly zero fire risk) in favor of faster and cheaper deployment of covered conductors. Unlike underground wire, covered conductors only provided a partial reduction of wildfire risk, as energy transfer could occur if maintenance lagged,

the coverings were improperly installed or degraded, or through electromagnetic induction. Indeed, SCE's 2023-2025 WMP quantified undergrounding a risk reduction impact of 98% per year whereas covered conductors only had a 51% impact. As a result of these tactical decisions, SCE was still heavily reliant on its robust PSPS program during extreme wind events to mitigate wildfire risk.

56. Edison also failed to publicly disclose another known wildfire risk: that high voltage transmission lines can induce current on nearby idle lines. Defendants did not provide a detailed accounting of SCE's plans to mitigate this risk in its WMP.

57. Defendants were aware that re-energizing power lines by induction was a key risk for worker safety as they could be killed or injured working on power lines which they believed were de-energized. In an April 2, 2024 SCE Safety Report submitted by SCE to the CPUC, SCE agreed to "focus on reducing induction-related incidents by: enhancing documented industry knowledge of induction mitigation practices; strengthening crew ability to differences in potential that could lead to induction; creating a procedure document for performing work in high-risk induction corridors; annual induction training; and assessing the potential use of induction suits."

58. Moreover, the fact that SCE grounded its idle lines confirms Defendants knew about induction or other re-energization risk for its idle transmission lines, but SCE did not have any process to update its grounding work to the latest safety standards. In the case of the idle Mesa-Sylmar line in Eaton Canyon (supported by noticeably shorter towers), Edison grounded those power lines using outdated procedures which were in effect during 1971. The fact that a power line was purportedly idled does not eliminate wildfire risk, as idle power lines had previously been blamed for setting fires. Idle lines were energized and responsible for the 2019 Kincade fire in Sonoma County.

59. Although, as Defendants boasted, no structures were destroyed in 2024, that year marked a stark uptick in fires ignited by Edison equipment. In 2024,

Edison's equipment ignited 178 fires (a level 49% above the 5 year average), up from 90 fire ignitions in 2023.

60. Accordingly, Defendants' claims that Edison reduced catastrophic wildfire risk by up to 85%-90%, and that it could rely on PSPS as a last resort mitigation tool to prevent fire ignition, were false and misleading because: (a) Defendants could not de-energize SCE's transmission lines in HFRAs due to reliability issues flagged by CAISO; (b) grid hardening efforts did not apply to those high-voltage transmission lines; (c) energized transmission lines could induce current on nearby idle lines, increasing ignition risk; (d) Defendants failed to mitigate CAISO's concerns by either undergrounding critical high voltage lines or upgrading the transmission system to enable PSPS; and (e) Defendants failed to account for foreseeable dangerous Red Flag extreme wind conditions in SCE's internal risk modeling. Defendants knew the risk modeling they boasted about failed to take into account the aforementioned deficiencies. With all of these vulnerabilities aligned in Eaton Canyon and Sylmar, the WMP and PSPS provided no meaningful wildfire defense in extreme conditions.

### F. The Eaton and Hurst Wildfires Expose Defendants' Deficient Wildfire Risk Reduction Efforts

61. Defendants' fire mitigation assurances proved false and misleading, as SCE failed to protect the public during extreme Santa Ana winds, which received a "Red Flag" warning from the National Weather Service ("NWS"). These dry, high-speed winds adversely impacted SCE's four live and one inactive transmission lines running through Eaton Canyon, a CPUC-designated "High Fire Threat District – Tier 3" abutting the community of Altadena, and two transmission lines running near Sylmar, another Tier 3 high wildfire threat district.

62. Southern California saw above average rainfall in the 2022-2023 and the 2023-2024 rain seasons (running from July through June), accelerating vegetation growth in the undeveloped areas. But starting on May 6, 2024, Los Angeles only

recorded .16 inches of rain of for the rest of the year – the second driest stretch on record. As a result of the "hydroclimate whiplash," wildfire risks increase through increased growth of vegetation, which is then dried out to exceptionally high levels.

63. On January 2, 2025, SCE's own meteorologists identified the potential for dangerous fire weather conditions, starting January 3.

64. The NWS warned of the extreme weather conditions as early as January 3, 2025, when it issued a "Fire Weather Watch" for January 7 through January 10, 2025.

65. By January 6, 2025, NWS "Red Flag" warnings had escalated to a PDS, including, not limited to, the Eaton Canyon/Altadena and Sylmar regions. NWS warned of "widespread damaging wind gusts 50-80 mph, Isolated 80-100 mph for mountains/foothills. Downed Trees and power outages. Use extreme caution with any potential ignition sources." A Red Flag warning indicates extreme fire danger and/or fire behavior due to warm temperatures, low humidity, dried vegetation, and strong winds. As depicted in the image below, PDS is the most severe warning issued by NWS to "highlight exceptional fire weather conditions (combination of meteorological and fuels) considered rare and/or especially impactful to the public and firefighting community":






4930-7586-1578.v1

66. The dire conditions were repeated by the NWS multiple times prior to January 7, 2025, including an eye-catching neon-pink-lettered warning of a "LIFE-THREATENING & DESTRUCTIVE WINDSTORM!!!" to capture the public's attention:




67. Early in the morning on January 7, 2025, a Whisker Labs, Inc. (an electrical fault monitoring company) analysis detected two faults, or electrical malfunctions, on Edison's grid near Altadena at 4:28 a.m. and 4:36 a.m. At this time, sustained winds had already exceeded 60 mph with gusts of up to 79 mph. Pursuant to Edison's public PSPS protocols, the thresholds for cutting power were easily exceeded, and were now coupled with evidence that the transmission system had been damaged or was malfunctioning in or near Eaton Canyon. Despite "actual conditions suggest[ing] more wildfire risk" under Edison's purported PSPS protocol, power continued to flow through Edison's Eaton Canyon transmission lines.

68. At around 10:29 a.m. on January 7, 2025, the Palisades fire ignited near the hills of the Pacific Palisades neighborhood of Los Angeles, and rapidly spread due to the windy conditions, overwhelming the capability of first responders, thereby meaning fewer resources to fight any new fires in the region. But because Edison's

PSPS protocol was hamstrung by its failure to remedy power grid reliability issues identified by CAISO, power continued to flow through Edison's Eaton Canyon transmission lines.

69. Measurements taken throughout January 7, 2025 confirmed the accuracy of the NWS's forecasts, with gusts reaching as high as 99 mph in Altadena. SCE later admitted in its post-PSPS report filed with the CPUC that peak winds reached 60 mph and 80 mph in gusts and "aligned with SCE's forecast." Despite the PSPS wind thresholds being greatly exceeded, power continued to flow through Edison's Eaton Canyon and Sylmar transmission lines.

70. At approximately 6:11 p.m., an electric arc flashed from a row of Edison overhead lines running though Eaton Canyon, which were captured on a local gas station surveillance video. At the same time, two more electrical faults were detected according to Whisker Labs analysis during a period of seconds in sync with the time stamps on the surveillance video – indicating both that power continued to flow through Eaton Canyon and that the electric arc observed were derived from Edison's infrastructure. Minutes later, eye-witnesses began to see the glow of flames underneath the transmission towers. The fire exploded, quickly engulfing the hillside and over the next 24 days, leveled large parts of the city of Altadena.

71. Around 10:11 p.m. that night, another fire started near the San Fernando Valley community of Sylmar under downed SCE transmission lines, dubbed the Hurst fire.

### G. Defendants Downplay SCE's Responsibility for the Eaton Fire

72. On January 8, 2025, SCE issued a press release downplaying responsibility for the Eaton fire stating:

> SCE has transmission facilities on the east side of Eaton Canyon. SCE's distribution lines immediately to the west of Eaton Canyon were de-energized well before the reported start time of the fire, as part of SCE's

Public Safety Power Shutoff (PSPS) program. SCE is currently conducting a review of the event.

73. For the Hurst fire, SCE first noted that "[w]hile the reported ignition site is within the Los Angeles Department of Water and Power's service area, SCE has transmission facilities near the reported ignition site."

74. The next day, on January 9, SCE publicly filed an Electric Safety Incident Report with the CPUC pursuant to California Public Utilities Code §315 ("ESIR"). In the ESIR, Defendants continued to evade acknowledging the role of SCE's equipment in the Eaton fire, stating that "no fire agency has suggested that SCE's electric facilities were involved in the ignition or requested the removal and retention of any SCE equipment." The ESIR further noted that although reporting "suggests SCE equipment may be associated with" the Eaton fire, its "preliminary analysis . . . of electrical circuit information for the energized transmission lines going through the area . . . shows no interruptions or electrical or operational anomalies" in the "12 hours prior to the [fire's reported start time] . . . until more than one hour after the reported start time of the fire." SCE claimed the ESIR would not have been submitted but for media attention and its receipt of attorney preservation notices. The ESIR did not identify that the energized Eagle Rock-Mesa 220kV, Mesa-Vincent No. 1 220kV, Mesa-Vincent No. 2 220kV, and Goodrich-Gould 220kV transmission lines were affected facilities.

75. On January 10, 2025, SCE filed its ESIR for the Hurst fire, identifying a circuit relay fault at 10:11 p.m. and that a downed power line was discovered at a tower on that circuit. SCE's ESIR identified the Eagle Rock-Sylmar transmission line as a potential ignition source for the fire, but claimed "SCE does not know whether the damage observed occurred before or after the start of the fire." The ESIR identified the Eagle Rock-Sylmar as an affected facility, which was also a transmission line that CAISO had warned should be excluded from PSPS events.

76. On January 23, 2025, Defendants pointed to a potential non-SCE source of the Eaton fire in a letter to attorneys representing Eaton fire victims, stating that Edison discovered a human encampment 300 yards downhill from the fire origin, "including tent remnants, at least two fire rings, food and water." Edison claimed "[i]t appeared that the campsite was occupied shortly before the Eaton fire ignited."

77. But the evidence for SCE's responsibility for igniting the Eaton fire is overwhelming:

(a) Video footage from a nearby gas station captured what appear to be electric arcs coming from SCE's transmission towers at 6:11 p.m. Video footage later shared by the *New York Times*, shows "flashes of light at 6:11 p.m. in the vicinity of three high-voltage electrical towers in Eaton Canyon, and then flames moments later." The flashes recorded on the video occurred at the same time as the electrical faults observed in the Whisker Labs data.

(b) Witnesses, such as Brendan Thorn, a resident living on Canyon Close Road adjacent to Eaton Canyon, noticed his power flicker and a few minutes later a neighbor called him to inform him of a fire under the SCE-owned power lines in Eaton Canyon.

(c) Multiple video and photographic evidence corroborate that fire emerged from the base of SCE's transmission towers in the minutes following the 6:11 p.m. faults and arcs.

(d) In addition to the transmission lines, SCE's distribution lines near Eaton Canyon were energized because homes in Altadena were still receiving power. Analysis conducted by Whisker Labs showed that some homes in SCE's service area in Altadena near Eaton Canyon were still energized around 6:15 p.m., further confirming that SCE's distribution circuits to the east of Eaton Canyon likely were energized at the time the Eaton fire ignited.

78. In the face of this overwhelming evidence, Defendants were forced to reverse course, and slowly admit that SCE was likely responsibility for the Eaton fire:

(a) SCE admitted in a January 27, 2025 letter to the CPUC that on January 12, 2025, the Los Angeles County Fire Department determined the coordinates of the preliminary origin of the fire and that SCE had three transmission towers in proximity to the origin. These towers were: (1) the M6T1 structure, carrying the Eagle Rock-Mesa 220kV and Mesa-Vincent No. 2 220kV transmission lines; (2) the M24T3 structure, carrying the Mesa-Vincent No. 1 220kV and Goodrich-Gould 220kV transmission lines; and (3) the M16T1 structure, carrying the Mesa-Sylmar transmission line, which is no longer in service. Three of the four energized lines were critical facilities that CAISO recommended be excluded from PSPS. SCE disclosed, contrary to its January 9, 2025 ESIR, that a fault was detected on its Eagle Rock-Gould transmission circuit at approximately 6:11 p.m. on January 7, 2025, resulting in an "increase in current on [Edison's] transmission system, including on the four energized lines on M6T1 and M24T3" – the two transmission towers in Eaton Canyon, above the area where the Eaton fire originated. SCE noted, however, the Eagle Rock-Gould transmission line does not traverse Eaton Canyon and that the increase in current was within design limits and operating criteria for the Eaton Canyon circuits. SCE further acknowledged the surveillance video obtained by the *New York Times* showing two flashes of light in Eaton Canyon at the time of the fault.

(b) On February 6, 2025 SCE disclosed it found evidence of potential arcing and damage to the grounding equipment for two of the three conductors on the idled Mesa-Sylmar line. Although Edison continued to claim that it did not know what caused the Eaton fire, it disclosed that it took additional precautionary measures relating to the idle line grounding issue and its PSPS limitations for transmission infrastructure. First, SCE disclosed that on January 12, 2025, it engaged a PSPS for the transmission lines in Eaton Canyon using a lower wind speed threshold, indicating its prior PSPS protocol was inadequate. Second, SCE revised its internal manuals to improve electrical grounding procedures to ensure proper grounding in the event other idle lines become re-energized.

(c) On April 11, 2025, the *Los Angeles Times* published an article containing an interview with Pizarro acknowledging the possibility that SCE's idle transmission equipment in Eaton Canyon could have ignited the fire through induction. The article stated: "'Induction seems to be a key thing to be looking at here because the idle line was not connected to any equipment,' Pizarro said. 'It had no direct source of power. It was like an extension cord sitting on your floor, not connected to the wall.'"

(d) On April 29, 2025, during a conference call with investors, Pizarro stated the Company had found no alternative explanation for the cause of the Eaton fire, and finally acknowledged "it is probable that EIX and SCE will incur material losses in connection with the Eaton Fire."

79. The Eaton fire burned over 14,000 acres, and is blamed for destroying 9,418 structures, killing 17 people, and injuring 9 fire fighters, and was not fully contained until January 31, 2025. Preliminary estimates for the losses caused by the Eaton fire are $8 billion to $17.5 billion, but those amounts could rise. The Company's potential liability may exceed the approximately $14.7 billion in current California Wildfire Fund assets as of December 12, 2024, and Pizarro did not rule out exhausting the Fund in his remarks during the April 29, 2025 conference call. If the Fund is exhausted, the Fund and the liability cap will be terminated. Thus, the Company may be liable for the remainder of the damages in addition to the $3.9 billion it would need to reimburse to the California Wildfire Fund for failing to prudently operate SCE's equipment – or the entirety of the claims if it is found to have acted with willful disregard for the safety of others.

80. The Company's ability to rely on the Wildfire Legislation's prudency presumption is at risk. To date, numerous fire victims, insurers, Los Angeles County, and the City of Pasadena have all filed lawsuits seeking significant damages against the Company. In these cases, plaintiffs have alleged multiple instances of negligence on the part of the Company in the maintenance and operation of SCE's electric

infrastructure. Discovery may reveal further evidence of willful or reckless conduct by the Company prior to the wildfires.

81. The Company faces additional liability risk as the Los Angeles City Council is exploring legal action against the Company for its role in the Hurst fire, which was also ignited by SCE's transmission equipment. While the Hurst fire caused considerably less damage than the Eaton fire (800 acres burned and damage to 2 structures), SCE has not disputed its transmission equipment was responsible for the Hurst fire, stating in a February 6, 2025 letter to the CPUC: "Absent additional evidence, SCE believes its equipment may be associated with the ignition of the Hurst Fire." SCE's February 6 letter further stated:

> [SCE] hardware supporting the insulator string for the top phase bundled conductors separated and caused the top phase to fall on the middle phase resulting in both falling to the ground at the base of Tower 6. This resulted in a relay operation and a lock-out on the Eagle Rock-Sylmar 220kV circuit at 10:11 p.m. on January 7, 2025.

82. Both the Eaton and Hurst fires were the foreseeable consequences of the same undisclosed deficiencies in Edison's wildfire risk planning, not the result of unexpected conditions or bad luck.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

83. During the Class Period, Defendants made materially false and misleading statements and omissions about the Company's WMPs, SCE's PSPS program, and the reduced risk of losses from catastrophic wildfires.[4]

### A. Defendants' 2021 Statements

84. The Class Period starts on February 25, 2021 when Edison released it Q4 2020 and FY 2020 results. On that day, Defendants held a conference call with

---

[4] The bold and italicized portions of the statements in this section, as well as the slides in ¶¶90, 92, 96, 99, 102, 105-106, are the statements alleged to be materially false and misleading.

investors. During the conference call, Pizarro told investors that SCE's wildfire mitigation efforts had successfully reduced infrastructure-related wildfire risk and that, for the second year in a row, the Company expected its $1 billion self-insurance to fully cover any related fire damages if necessary, stating:

> ***Since the end of 2018, SCE's execution of its wildfire mitigation strategy has reduced the risk of wildfires associated with utility infrastructure despite a record-setting California wildfire season last year. For the second consecutive year, we do not believe damages from any wildfire alleged to be caused by SCE equipment will exceed insurance.***

85. During the call, Defendants also spoke about SCE's PSPS as a necessary and effective wildfire prevention tool. Pizarro assured investors that the use of SCE's PSPS had prevented numerous wildfire ignitions in 2019 and 2020, stating:

> ***SCE continues to improve its public safety power shutoff, or PSPS operations, with public safety being the paramount consideration. SCE uses PSPS only when conditions warrant. Let me underscore the need for PSPS despite the hardships it creates. By noting that in 2019 and 2020, post PSPS patrols found at least 60 incidents of wind-related damage that could have potentially caused ignitions.***

86. In a February 26, 2021 Business Update, Defendants touted PSPS as part of SCE's "***foundational strategy for mitigating wildfire risk***," describing it as "***[d]e-energization based on circuit-specific wind speed thresholds***."[5]

87. On February 25, 2021, Edison also filed its Annual Report on Form 10-K with the SEC for FY 2020, which was signed by Pizarro and Rigatti. Regarding

[5] A substantially similar false and misleading statement was repeated in Edison's Business Updates to investors on the following dates: April 28, 2021; July 30, 2021; and November 3, 2021.

SCE's PSPS, the FY 2020 Form 10-K stated: "***In addition to the investments SCE is making through its WMP, SCE also uses its Public Safety Power Shutoffs ('PSPS') program to proactively de-energize power lines to mitigate the risk of catastrophic wildfires during extreme weather events***."[6]

88. On July 29, 2021, Defendants held a conference call with investors to discuss Edison's Q2 2021 results. Pizarro touted the strategic importance of SCE's PSPS to the Company's wildfire risk reduction, stating: "***The utility will use the tools at its disposal to mitigate wildfire risk. This includes deploying covered conductor at a level informed by the final decision augmented by using Public Safety Power Shutoffs, or PSPS, to achieve the risk reduction originally contemplated for the benefit of customers***."

89. On November 2, 2021, Defendants held a conference call with investors to discuss Edison's Q3 2021 results. By this time, Edison and SCE were using Moody's RMS wildfire model to assess and quantify how SCE's wildfire mitigation and PSPS were reducing the risk of losses from catastrophic wildfires. During the conference call, and in subsequent conference calls with investors, Defendants publicly endorsed, adopted, and reported on the Moody's RMS model results. During the November 2, 2021 call, Pizarro stated: "***In total, considering physical mitigation measures such as covered conductor, operational practices such as tree removals, inspections and vegetation management and the use of PSPS, SCE estimates that it has reduced the probability of losses from catastrophic wildfires by 55% to 65% relative to pre-2018 levels***."

[6] In Edison's SEC Form 10-K filed February 24, 2022, signed by Pizarro and Rigatti, Defendants made a substantially similar false and misleading statement, stating: "***SCE also uses its PSPS program to proactively de-energize power lines as a last resort to mitigate the risk of catastrophic wildfires during extreme weather events***." Similarly in Edison's SEC Forms 10-K filed on February 23, 2023 and February 22, 2024 for FY 2022 and FY 2023, respectively, signed by Pizarro and Rigatti, Defendants made a substantially similar false and misleading statement, stating: "***SCE also uses its PSPS program to proactively de-energize power lines as a last resort to mitigate the risk of significant wildfires during extreme weather events***."

90. In a slide presentation accompanying the November 2, 2021 conference call, Defendants asserted that SCE's wildfire mitigation and PSPS had reduced the probability of losses from catastrophic wildfires by 55%-65%, from pre-2018 levels. The relevant slide stated:




### B. Defendants' 2022 Statements

91. On February 24, 2022, Defendants held a conference call with investors to discuss Edison's Q4 2021 and FY 2021 results. During the conference call, Pizarro touted that SCE had further reduced the probability of losses from catastrophic wildfires through its wildfire mitigation and PSPS, stating:

> ***Overall, SCE estimates that its mitigation work through December of last year has reduced the probability of losses from catastrophic wildfire by 65% to 70% relative to pre-2018 levels, and please note that this is an increase from the 55% to 65% we reported previously for mitigation work through June 2021.***



4930-7586-1578.v1

92. In a slide presentation accompanying the February 24, 2022 conference call, Defendants confirmed that SCE's wildfire mitigation and PSPS had reduced the probability of losses from catastrophic wildfires by 65%-70%, from pre-2018 levels. The relevant slide stated:




93. On May 3, 2022, Defendants held a conference call with investors to discuss Edison's Q1 2022 results. During the conference call, Pizarro repeated that SCE had reduced the probability of losses from catastrophic wildfires by 65%-70% through its wildfire mitigation and PSPS, stating: "***Over the last year, I've been updating you on SCE's substantial reduction of wildfire risk. Relative to pre-2018 levels SCE estimates, it has reduced the probability of losses from catastrophic wildfire by 65% to 70% and continued investments will further reduce this risk***."

94. On July 28, 2022, Defendants held a conference call with investors to discuss Edison's Q2 2022 results. During the conference call, Pizarro discussed the importance of PSPS, stating:



4930-7586-1578.v1

> ***SCE has achieved the majority of wildfire risk reduction through covered conductor and other system hardening measures, vegetation management and equipment inspections. Public safety power shutoffs or PSPS, provide additional risk reduction that is critical during extreme weather and fuel conditions. SCE also continues to implement cutting-edge technologies to mitigate against high-impact wildfires.***
>
> ***For example, the utility is leveraging machine learning to improve the accuracy of wind speed forecast at around 500 SCE weather station locations, and this will help better predict which areas may reach or exceed PSPS thresholds.***

**C. Defendants' 2023 Statements**

95. On February 23, 2023, Defendants held a conference call with investors to discuss Edison's Q4 2022 and FY 2022 results. During the call, Pizarro told investors that SCE had successfully increased the reduced risk of losses from catastrophic wildfires to 75%-80%, from pre-2018 levels, through SCE's wildfire mitigation and PSPS, stating:

> ***SCE successfully executed its wildfire mitigation plan and updated the key statistics shown on Page 5. That is that SCE now estimates it has reduced the probability of losses of catastrophic wildfires by 75% to 80% compared to pre-2018 levels and critically with much lower reliance on PSPS, now only 15%, as hardening and other mitigations continue as depicted on Page 6.***

96. In a slide presentation accompanying the February 23, 2023 conference call, Defendants confirmed that SCE's wildfire mitigation and PSPS had reduced the probability of losses from catastrophic wildfires by 75%-80%. The relevant slide stated:




97. On May 2, 2023, Defendants held a conference call with investors to discuss Edison's Q1 2023 results. During the call, Pizarro reemphasized that SCE had reduced the probability of losses from catastrophic wildfires by 75%-80% through its wildfire mitigation and PSPS, stating:

> ***In the near term, SCE continues its diligent execution of its Wildfire Mitigation Plan and has reduced the probability of losses from catastrophic wildfires by 75% to 80% compared to pre-2018 levels, predominantly from grid hardening measures that allow the utility to mitigate risk while keeping electricity flowing to our customers.***

98. On July 27, 2023, Defendants held a conference call with investors to discuss Edison's Q2 2023 results. During the call, Pizarro told investors that SCE had successfully increased the reduced risk of losses from catastrophic wildfires to 85% through SCE's wildfire mitigation and PSPS, stating: "***Incorporating SCE's latest mitigation data into the industry-leading North America wildfire HD model.***

***Moody's RMS now estimates SCE has reduced the probability of losses from catastrophic wildfires by 85% compared to pre-2018 levels as highlighted on Page 6***."

99. On July 28, 2023, Edison published on its website a Business Update for investors with slides discussing the Company's success in reducing the probability of losses from a catastrophic wildfire by 85%. The relevant slide stated:




100. On November 1, 2023, Defendants held a conference call with investors to discuss Edison's Q3 2023 results. During the call, Pizarro reemphasized that SCE had reduced the probability of losses from catastrophic wildfires by 85% through its wildfire mitigation and PSPS, stating: "***SCE has made tremendous progress since 2018, reducing its risk of losses from catastrophic wildfires by 85%. SCE has differentiated itself through its multilayered wildfire mitigation strategy. This is anchored by grid hardening and includes enhanced vegetation management, asset inspections and other programs***."

**D. Defendants' 2024 Statements**

101. On February 22, 2024, Defendants held a conference call with investors to discuss Edison's Q4 2023 and FY 2023 results. During the call, Pizarro told



4930-7586-1578.v1

investors that SCE had again successfully increased the reduced risk of losses from catastrophic wildfires, this time to 85%-88% through SCE's wildfire mitigation and PSPS, stating: "***Incorporating this progress into the independent wildfire risk model managed by Moody's RMS, you can see on Page 5 that SCE has achieved 85% to 88% risk reduction as compared to pre-2018 levels***."

102. On February 23, 2024, Edison published on its website a Business Update for investors with slides discussing the Company's success in reducing the probability of losses from a catastrophic wildfire by 85%-88% through SCE's wildfire mitigation and PSPS. The relevant slide stated:




103. On April 30, 2024, Defendants held a conference call with investors to discuss Edison's Q1 2024 results. During the conference call, Pizarro reemphasized that SCE had reduced the probability of losses from catastrophic wildfires by 85%-88% through its wildfire mitigation and PSPS, stating:

> ***I will point out that SCE has not seen ignitions due to the failure of covered conductor, and the program is well recognized for its effectiveness. Putting this all together into what it means for reducing***

***future risk of losses from wildfires. We estimate the risk is 85% to 88% lower than pre-2018.***

104. On July 25, 2024, Defendants held a conference call with investors to discuss Edison's Q1 2024 results. Pizarro reemphasized that SCE had reduced the probability of losses from catastrophic wildfires by 85%-88% through its wildfire mitigation and PSPS, stating: "On page 5, ***we reemphasized the estimated wildfire risk reduction of 85% to 88% compared to pre-2018.***"

105. Page 5 of the a slide presentation accompanying the July 25, 2024 conference call, stated as follows:




106. On October 29, 2024, Defendants held a conference call with investors to discuss Edison's Q3 2024 results. In the accompanying slide presentation, Defendants again asserted that SCE's wildfire mitigation and PSPS had significantly reduced the risk of losses from catastrophic wildfires. The relevant slide stated:




107. Defendants' statements as alleged in ¶¶84-106, were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded as set forth in more detail in ¶¶14-82 above, were that:

(a) Defendants' statements regarding SCE's PSPS program in ¶¶85-88, 94 were false and misleading because:

(i) CAISO's Transmission Plan warned Defendants to exclude PSPS from critical transmission lines traversing Eaton Canyon and the Sylmar area because triggering PSPS could result in major overloads or load loss and adverse impacts on the regional transmission system's reliability. ¶¶16, 38-49. As a result, SCE could not safely and effectively use PSPS to mitigate transmission line wildfire risk in the precise locations where SCE equipment ignited the Eaton and Hurst fires. *Id.*

(ii) Defendants failed to timely complete the CAISO-authorized line rating upgrade to another transmission line so that SCE could be relieved from excluding PSPS on the Eaton Canyon and Sylmar transmission lines. ¶45. Although

SCE planned to complete the project by the Q4 2023, it had not done so prior to the start of the 2025 Los Angeles wildfires. *Id.* The line upgrades would have allowed Edison to safely and more effectively use PSPS on the Eaton Canyon and Sylmar transmission lines during the dangerous Red Flag – PDS wind conditions preceding the Eaton Canyon and Hurst fires. *Id.*

(iii) The CAISO limitations on PSPS for SCE's transmission lines created significant deficiencies in SCE's WMPs because it did not have approvals to harden transmission lines with covered conductors to reduce its dependency on PSPS for transmission equipment. ¶¶46-47. Similarly, without PSPS, there was significant risk that transmission lines could re-energize idled transmission lines via electromagnetic induction, adding to the number of failure points that could start a wildfire. ¶¶56-58. Reenergization of idled lines was particularly hazardous because SCE improperly grounded those idled lines based on safety procedures in place over half a century ago. ¶14. In fact, shortly after the Eaton fire, SCE took immediate steps to change its internal maintenance manual that instruct crews on how to properly ground idle equipment and hardened other idle towers and lines across its network to prevent reenergizing incidents. ¶152.

(b) Defendants' statements that SCE's wildfire mitigation and PSPS were reducing the risk of loses from catastrophic wildfires, as alleged in ¶¶84, 89-93, 95-106, were false and misleading because in addition to ¶¶107(a)(i)-(iii) above, Defendants inflated SCE's catastrophic wildfire risk reduction percentages by failing to provide information regarding the deficiencies described above (¶¶50-53) for use in Moody's RMS North America Wildfire HD Models. Because Moody's RMS model considered the positive impacts of SCE's grid hardening and low wind speed thresholds for PSPS on the distribution system, but not the negative effects of the PSPS exclusions on the transmission system, the resulting output significantly overstated the catastrophic wildfire risk reduction percentages. *Id.* The Company's

internal risk models also failed to "consider rare but foreseeable and significant risks" of extreme wind events. ¶54.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

108. Each defendant knew or acted with deliberate recklessness that material facts were being concealed from investors during the Class Period and the statements set forth in ¶¶84-106 above would be misleading to investors when made. Defendants' misconduct was knowing or deliberately reckless based on the factual allegations above and the following:

### A. Defendants' Knowledge and Access to Information Supports Scienter

109. The Individual Defendants' knowledge of and access to information involving SCE's wildfire risk mitigation efforts is demonstrated in their active involvement in overseeing and monitoring the steps taken by Edison to mitigate risk, as well as other facts confirming that the Individuals Defendants were undoubtedly aware of the deficiencies in those mitigation efforts.

110. Because catastrophic wildfire mitigation was critical to operations, the Company internally tracked metrics used to inform wildfire mitigation risk reduction, such as grid hardening, vegetation management, ignition reduction, and PSPS. The Safety and Operations Committee of the SCE Board of Directors kept management and the rest of SCE's Board, on which Pizarro sat, informed of the measures and resources to prevent, mitigate, or respond to safety-related incidents and specifically made recommendations to management regarding the Company's operations, significant developments, resources, risks and risk mitigation plans related to wildfires, business resilience and emergency response, and climate adaptation.

111. In an August 29, 2024 safety presentation to the CPUC, SCE represented that its Board of Directors and Pizarro "regularly observe[] operations across SCE service area." The presentation further claimed that SCE's Safety and Operations Committee (the "SOC") and management monitor safety performance using a

comprehensive set of metrics across key safety risk areas, including wildfire safety. The SOC meets at least four times a year, then reports to the full SCE Board of Directors "key safety and operational" updates following each meeting.

112. On multiple earnings calls, Pizarro endorsed and adopted the finding of Moody's RMS model, calling it an "industry-leading" and "widely trusted" model, and touting the model's capabilities, thus displaying his knowledge of its inner-workings. For example, during Edison's July 27, 2023 Q2 2023 earnings call, Pizarro stated:

> As it has since 2021, SCE uses a rigorous insurance industry [leading] modeling approach to estimate the probability of losses from catastrophic wildfires relative to the thresholds by AB 1054. Incorporating SCE's latest mitigation data into the industry-leading North America wildfire HD model. Moody's RMS now estimates SCE has reduced the probability of losses from catastrophic wildfires by 85% compared to pre-2018 levels as highlighted on Page 6.

113. Also on the April 30, 2024 Q1 2024 earnings call, Pizarro claimed:

> SCE's estimate comes from Moody's RMS industry-leading model, widely trusted by insurers. This model considers intricate factors, terrain, vegetation, historical data and more to predict wildfire probabilities.
>
> . . . [T]o estimate the probabilities of losses in dollar terms, we employ a stochastic model. This model runs 50,000 simulations, considering potential emissions and fire sizes while incorporating SCE's mitigation strategy. This approach contrasts with simpler deterministic methods used by some other companies and regulators that only analyze past events. In summary, our rigorous data-driven approach validated externally paints a clear picture.

114. As part of their roles, Defendants also personally accessed reports and data that highlighted to them the risk of a wildfire catastrophic event. For instance, on April 30, 2024 during the Q1 2024 earnings call, in response to an analyst question about "expectations into the season given all of the derisking has been accomplished over time," Pizarro pointed to white papers he personally reviewed to assess the near- and long-term risk of wildfire and stated: "[W]e're going to see increased, not decreased climate-driven wildfire risk conditions."

115. Defendants also both publicly, and repeatedly, acknowledged that they closely monitored and tracked the WMP's metrics, and were able to respond to analysts' questions with highly detailed knowledge regarding the efficacy and costs of the mitigation activities, and further describe the technical methodology by which Edison evaluated it risks:

(a) On April 27, 2021 during the Q1 2021 earnings call, an analyst asked Pizarro to comment on the Company's "risk profile" framed against the Company's "mitigation efforts" and "wildfire probabilities." Pizarro touted reviewing data in "detail" and displayed understanding as to what mitigations were most "helpful" to "narrow" risk:

> [I]n terms of the mitigations, I went through them in a fair amount of detail . . . the approach we have taken over the last several years has been a risk-informed approach. So when we went out to replace the first mile of bare wire with covered conductor, it was the mile that was in one of the highest-risk areas possible, right? So we've been going down the stack, if you will, by trying to address the highest-risk areas first where the mitigations would have the highest impact on risk reduction . . . .
>
> That, I think, is really helpful and constructive in terms of framing that risk profile. That risk profile continues to narrow.

(b) Also on April 27, 2021, Pizarro responded to an analyst question regarding the Company's "approach" to "PSPS" demonstrating knowledge as to the Company's ability to "hone down" the scope of PSPS:

> We – utility had significant prior investment in sectionalizing the grid. I remember reporting to you all in earnings call, probably going 1 year, 1.5 years back about how, at that point . . . if you look at our circuits in high-fire-risk areas, on average, it could be cordoned off into 4 separate sections, right, which allowed us to better target a PSPS event. Well, we continue to add segmentation, sectionalization devices to circuits in high-fire-risk areas. So that continues to hone down the scope of PSPS events.

(c) On July 29, 2021 during the Q2 2021 earnings call, an analyst asked whether the Company was considering "undergrounding" as opposed to "covered conductor," and Pizarro responded:

> [W]e are looking at all the tools in the toolbox. Given our terrain and the fact that the really predominant – one of the predominant forms of ignition in the past has been from contacts with foreign objects. We find that covered conductor has really provided the optimal tool for reducing risk while maintaining affordability for customers. And so we see that covered conductor has something like 70% of the risk reduction that undergrounding has. The cost difference in the numbers we've seen to date, obviously, the team continues to keep track of what's going on . . . the latest numbers we've seen are that covered conductor cost us something like $456,000 a mile whereas underground, on average, in our territory, it will cost you about $3.4 million a mile.
>
> . . . [B]ut at least with our territory, with our incidence of historical ignitions, we believe that covered conductor provides a – really an optimal tool in terms of both risk reduction and affordability.

(d) On November 1, 2022 during the Q3 2022 earnings call, in providing an update that "SCE has made marked advancements in its wildfire mitigation and emergency preparedness capabilities," Pizarro touted access to "extensive data."

(e) On July 27, 2023 during the Q2 2023 earnings call, Rigatti shared:

> [W]e've . . . continually found ways to improve. To give you an example, SCE programmatically inspects about 216,000 structures in high fire risk areas every year from the ground and the air, which in the past was performed by distinct teams. We have transformed the program by combining ground and aerial inspections into a single 360-degree inspection process.

### B. The Alleged Fraud Concerned Edison's Core Operations

116. The misrepresentations and omissions alleged herein involve the core of the Company's business: to safely operate and maintain the electrical infrastructure, including ensuring those lines do not cause catastrophic wildfires. Pizarro and Rigatti were the two top executives – CEO and CFO – at Edison and led its day-to-day operations. Given the unquestioned importance of these matters to the day-to-day operations and the existential threat wildfires have on Edison's business, it is completely implausible that the Individual Defendants, who were charged with managing and overseeing Edison's day-to-day operations, were not aware of the misrepresented and omitted material facts regarding such matters.

117. Pizarro expressly recognized that SCE's "core operations" involved the execution of the "wildfire mitigation plan" on October 29, 2024 during the Q3 2024 earnings call. On April 27, 2021 during the Q1 2021 earnings call, he also stated: "Fire mitigation has been an integral part of SCE's operational practices for years . . . . As climate change intensified wildfire risk, the utility stepped up its comprehensive wildfire mitigation strategy and has made substantial progress, particularly through its WMP." While addressing an analyst's concerns regarding wildfire risk on April 27,

2021 during the Q1 2021 earnings call, Rigatti recognized: "[W]e do know that wildfire mitigation is very important to the safety of our communities."

118. Defendants represented that SCE's wildfire mitigation efforts constituted an important and substantial part of its operations. For instance, on July 29, 2021 during the Q2 2021 earnings call, Pizarro stated: "We are facing a significant wildfire risk across the state. We've seen it in our area. We strongly believe that the wildfire mitigation plans that we prepared really help address that risk." Importantly, SCE expended substantial sums of its capital on wildfire mitigation – about $5 billion in wildfire mitigation-related capital, and expected to invest more than $6 billion. Pizarro touted this investment as one of the "highest" in the industry on April 30, 2024 during the Q1 2024 earnings call. During each conference call during the Class Period, Defendants reported on SCE's execution of the WMP.

119. Pizarro and Rigatti were the top two executives at the Company during the 2017 Thomas and 2018 Woolsey fires and were privy to the ***$9.9 billion*** the Company had to pay out to resolve legal claims relating to the Thomas and Woolsey fires. On February 25, 2021 during the Q4 2020 earnings call, Pizarro referred to "[t]he wildfire experience" "over the last several years" as a "challenging one" but assured the investing public that the Wildfire Legislation would help to "create a restored framework." If the Company did not secure a safety certificate, it would not be entitled to the presumption of prudence, and would not be able to avail itself of immediate access to the California Wildfire Fund. Defendants understood the importance of compliance and thus monitored the progress of the wildfire risk reduction plan, and took personal responsibility for reporting Edison's progress on covered conductor miles, inspections and vegetation management, PSPS, and technological monitoring. In doing so, Defendants repeatedly indicated their close involvement in overseeing the progress of the WMP's implementation, often by providing detailed information to the investing public about the reduction of risk.

120. Pizarro took personal responsibility for updating investors on SCE's wildfire risk reduction efforts, noting on the July 28, 2022 earnings call: "I am pleased with the [utility's] execution of this program which has and will continue to substantially improve safety for customers" and provided detailed statistics on the risk reduction percentages and tasks completed. He did the same on the May 3, 2022 earnings call, stating: "Over the last year, I've been updating you on SCE's substantial reduction of wildfire risk." Pizarro referred to these mitigations as a "team" effort on April 30, 2024 when reporting Q1 2024 earnings and while updating the public with specific risk reduction measured achieved: "I'm pleased with the progress our team has made, and I look forward to continued progress making our communities even safer."

121. Rigatti also conveyed her responsibility for tracking and assessing wildfire risk by stating on July 28, 2022 during the Q2 2022 earnings call: "[W]e're seeing a trend that people are starting to see the risk mitigation and acknowledging it."

### C. Defendants Were Motivated to Mislead Investors About Reducing Edison's Catastrophic Wildfire Risk to Improve Borrowing Costs

122. Defendants' scienter is further supported by facts demonstrating their efforts to prop up the Company's credit ratings. Public utility companies are particularly sensitive to borrowing costs because they must regularly raise debt to fund capital spending on transmission and distribution infrastructure. Edison confirms in its SEC filings that it "regularly accesses the capital markets to finance its activities and is expected to do so by its regulators as part of its obligation to serve as a regulated utility." Edison further acknowledges that "[c]redit rating downgrades increase the cost and may impact the availability of short-term and long-term borrowings, including commercial paper, credit facilities, bond financings or other borrowings."

123. But unlike most companies, SCE must receive CPUC approval to increase the rates charged to its customers to offset any increased borrowing costs. In

California, rate cases typically occur only once every four years. Because the Company cannot unilaterally raise rates, rating downgrades negatively impact its profitability.

124. The rating agencies explicitly linked the Company's risk for wildfire related liability to its credit risk profile. For instance, between February 2018 and March 2019, Fitch downgraded Edison's issuer credit ratings twice, citing "potential financial exposure to large, destructive California wildfires that raged across the state." A key driver of the downgrades was "[t]he sharp increase in the magnitude and frequency of catastrophic wildfires in California in 2017 and 2018, [which] underscores risk that this phenomenon may continue, and with it mounting liabilities and financial stress on investor-owned utilities (IOU) in the state." These rating actions limited Edison's access to favorable borrowing rates.

125. The resulting actions led Edison to issue $1.25 billion in preferred equity in 2021. The issuance was needed to support its credit rating profile so that it could fund its wildfire liabilities with debt.

126. The rating agencies provided Defendants the roadmap to improvement. Fitch wanted to see "[c]onsistent, incremental progress reducing firestorm risk in the intermediate to long term," and "[m]ore manageable utility-triggered wildfire activity consistent with post-2017 /2018 levels in the intermediate term."

127. On the July 28, 2022 earnings call, defendant Rigatti highlighted that Moody's and Fitch raised their outlook, "driven," in part by "the utility's significant progress addressing wildfire risk." Likewise, defendant Pizarro confirmed on the February 23, 2023 earnings call: "[W]e will be focused on . . . pursuing upgrades to our credit ratings. We believe this is well warranted considering the significant wildfire risk reduction by SCE, the state's strong firefighting capabilities, and supportive California regulation."

128. Defendants were rewarded by their claims that Edison had reduced its catastrophic wildfire risk. For example:

(a) In March 2023, Moody's credited the following for upgrading the credit outlook for Edison:

> SCE's wildfire risk, though still significant, appears to be declining. In 2017 and 2018, SCE experienced catastrophic wildfires that have so far resulted in about $8.8 billion of estimated gross loss ($4.6 billion of net loss) related to wildfire claims. Since then, SCE has spent almost $6 billion, aggressively hardening its infrastructure to guard against its equipment from sparking wildfires. The centerpiece of the hardening program is to cover or underground 10,000 miles of overhead distribution lines in high-risk zones. Post 2018, SCE's estimated gross wildfire loss has dropped to $696 million on a cumulative basis. Fires alleged to have been started by SCE equipment in 2017 and 2018 damaged 2,739 building structures, but only 266 since 2018.

(b) In December 2024, Fitch reported:

> The large reduction in structures destroyed by SCE-linked wildfires in 2019-2024 compared with 2017-2018 is a key factor supporting EIX's IDR and Stable Outlook. SCE appears to have made progress strengthening the grid's fire resilience in light of materially reduced wildfire activity over the past five years, despite challenging conditions.

129. Accordingly, Defendants were motivated to misleadingly state the extent by which their wildfire mitigation efforts and PSPS protocols reduced the Company's catastrophic wildfire risk to encourage credit rating increases.

130. Wildfire risk similarly impacts insurance rates. Defendants were likewise motivated to decrease insurance costs by overstating the extent of catastrophic wildfire risk reduction. Defendants' focus on this issue is reflected in their decision to use Moody's RMS wildfire risk model, a model used by insurers, to

represent to its insurers that the Company had purportedly minimized its catastrophic wildfire risk which may be borne by insurers.

### D. The Temporal Proximity Between Defendants' Misrepresentations and the Revelation of Information Undermining Those Representations

131. Defendants' scienter is further evidenced by the temporal proximity between their material misrepresentations and the revelation of information undermining those representations. For example, in October 2024, Defendants reaffirmed the 85%-90%+ risk reduction despite conditions that indicated an increased wildfire risk. Southern California received above average rain in the two previous rainy seasons. Increased rain results in increased vegetation. On October 7, 2024, U.S. The National Oceanic and Atmospheric Administration issued its 2024-2025 U.S. Winter Outlook, warning that La Niña conditions were expected, leading to drier than average conditions in the southern U.S. The resulting "hydroclimate whiplash" meant that there was both more vegetation and expected drier conditions. Even though the environmental conditions indicated that Edison's wildfire risk had increased, Defendants made no adjustments to their statements to the market on October 29, 2024, and continued to represent that a catastrophic wildfire started by Edison was just a remote possibility. Not so. Just over two months later, Defendants' statements were proven false and misleading as the same deficiencies in Edison's risk management resulted in Edison equipment starting two fires in the Los Angeles area, one of which became the second most destructive wildfire in California history.

## VII. LOSS CAUSATION

132. Defendants, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. Throughout the Class Period, Edison common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions regarding SCE's WMP, PSPS protocols, and the reduced probability of losses from catastrophic wildfires. Lead Plaintiffs and other members of the Class purchased or otherwise acquired Edison common stock relying

upon the integrity of the market price for Edison common stock and market information relating to Edison and SCE. When the relevant truth became known, the price of Edison common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Lead Plaintiffs and the Class.

133. As discussed below, the artificial inflation in the price of Edison stock was dissipated by a series of partial corrective disclosures of new Company-specific material information. The resulting significant stock price declines upon release of this new material information, and related increased risks, were due to Company-specific, fraud-related disclosures, and not a result of macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

**January 7, 2025 Disclosure**

134. According to Cal Fire, the first reports of the Eaton fire came in at 6:18 p.m. Pacific Time ("PT") on January 7, 2025, after the market closed. The fire was initially reported near Altadena Drive and Midwick Drive in the Eaton Canyon area, within SCE's service area. Within just hours after the Eaton fire started, news outlets (NBC4 News) and media sources began reporting on, and sharing live footage of the Eaton fire (*Los Angeles Times*). On the same day, Cal Fire reported that the Hurst fire began at 10:29 p.m. PT, also within SCE's service area.

135. On January 8, 2025, a *Bloomberg* article reported that Edison's stock price "sank" on January 8, 2025 "as investors questioned whether [SCE's] equipment played some role" in the Eaton fire. On January 8, 2025, J.P. Morgan Markets ("J.P. Morgan") published a report also confirming that Edison's stock price had declined "11%" on news of the Eaton fire, "as investors digested this out-of-season fire event."

136. In direct response to the news of these wildfires, Edison's share price dropped 10.2% on January 8, 2025, from a closing of $77.38 per share on January 7, 2025 to a closing of $69.50 per share on January 8, 2025, the next trading day.

137. This new, Company-specific, material information was directly related to the false and/or misleading statements previously made by the Defendants. However, Edison's stock price remained inflated as Defendants' misconduct continued to be concealed from investors.

**January 8-9, 2025 Disclosures**

138. Beginning on January 8, 2025, after the market closed, through January 9, 2025, when the market was closed in observance of a National Day of Mourning for former President Jimmy Carter, additional new Company-specific material information about the Eaton fire was disclosed to investors, partially revealing the false and misleading nature of Defendants' statements concerning Edison's purported reduced probability of losses from catastrophic wildfires.

139. On January 8, 2025, Edison issued a news release confirming that: the Eaton fire started in SCE's service area, SCE had energized transmission lines near the ignition site, and Defendants were conducting a review of the Eaton fire. The release stated:

> The Palisades Fire began Tuesday morning; the reported area of origin is not in Southern California Edison's service area. The Eaton Fire began Tuesday afternoon in SCE's service area. SCE has transmission facilities on the east side of Eaton Canyon. SCE's distribution lines immediately to the west of Eaton Canyon were de-energized well before the reported start time of the fire, as part of SCE's Public Safety Power Shutoff (PSPS) program. SCE is currently conducting a review of the event. The Hurst Fire began late Tuesday evening. While the reported ignition site is within the Los Angeles Department of Water and Power's service area, SCE has transmission facilities near the reported ignition site, and the company is currently conducting a review of the event.

140. On January 9, 2025, the *Pasadena Now* news outlet published an article titled "The Moment the Eaton Fire Ignited," with cell phone images of the first

moments of the Eaton fire ignition showing that the fire had started under transmission towers in the SCE service area.

141. Also on January 9, 2025, financial analysts published reports updating investors on the size, status, and damage caused by the Eaton fire. For example on January 9, 2025, Jefferies LLC published a report stating that the fire had burned "10,600 acres, 0% contained, 1,056 structures damaged/destroyed, 5 fatalities, & 37k structures threatened. We are far more focused on Eaton than Palisades." Morgan Stanley & Co. LLC also issued a report the same day stating:

> As of 8pm EST on Wednesday, the fire had burned about 10,600 acres, 200-500 structures had been damaged or destroyed, 0% containment, no indication of the cause. This fire ignition point appears to have been in EIX service territory. The company indicated that it had de-energized distribution lines in the area well before the start of the fire, but there are also transmission facilities in the area and the company is conducting a review of the event so we can't rule these out as potentially involved in the ignition.

142. On January 9, 2025, SCE filed an ESIR with the CPUC. In the report Edison stated that no fire agency had linked the Company's equipment to the fire and online publications were reporting that SCE equipment may be associated with the Eaton fire. The report stated:

> SCE submits this report out of an abundance of caution because the incident may meet the technical reporting criteria. The Eaton Fire has received significant media attention and has caused property damage exceeding $200,000. SCE received evidence preservation notices from counsel representing insurance companies in connection with the fire, and there are online publications that seemingly suggest SCE equipment may be associated with its cause. Therefore, the incident is arguably "allegedly attributable to utility facilities," which technically triggers this

> report. To date, no fire agency has suggested that SCE's electric facilities were involved in the ignition or requested the removal and retention of any SCE equipment. Additionally, preliminary analysis by SCE of electrical circuit information for the energized transmission lines going through the area for 12 hours prior to the reported start time of the fire shows no interruptions or electrical or operational anomalies until more than one hour after the reported start time of the fire. Aside from the preservation notices suggesting SCE's potential involvement and significant media attention surrounding the fire, we do not believe this incident meets the reporting requirements.

143. As a direct result of these disclosures, Edison's share price dropped $4.50 per share, or 6.6%, from a closing of $69.50 per share on January 8, 2025 to a closing of $65.00 per share on January 10, 2025, the next trading day.

144. The new, Company-specific, material information released January 8-9, 2025, was directly related to the false and/or misleading statements previously made by the Defendants. However, Edison's stock price remained inflated as Defendants' misconduct continued to be concealed from investors.

**January 10-13, 2025 Disclosures**

145. Beginning on January 10, 2025, after the market closed, additional new Company-specific material information about the Eaton fire was disclosed to investors, partially revealing the false and misleading nature of Defendants' statements concerning Edison's purported reduced probability of losses from catastrophic wildfires.

146. On January 10, 2025, Edison publicly filed an ESIR with the CPUC regarding the Hurst fire stating that a downed SCE conductor was discovered at a tower associated with transmission line equipment near the origin of the fire. The report stated:

> SCE submits this report because it meets new reporting criteria established by the Commission in late 2024 that require the reporting of an incident that prompts "a government entity to investigate whether the infrastructure owned or operated by the utility caused a wildfire." The fire has also received significant media attention, which is also one of the reporting criteria. The Hurst Fire is a brush fire reported in the Sylmar area at approximately 10:10 p.m. on January 7, 2025. Preliminary information reflects the Eagle Rock - Sylmar 220 kV circuit experienced a relay at 10:11 p.m. A downed conductor was discovered at a tower associated with the Eagle Rock - Sylmar 220 kV circuit, but SCE does not know whether the damage observed occurred before or after the start of the fire. SCE understands that fire agencies are investigating whether SCE equipment was involved in the ignition of the Hurst Fire. The investigation is ongoing.

147. On January 12, 2025, the Company also issued a press release regarding the Hurst fire stating:

> On Jan. 10, SCE filed an ESIR related to the Hurst Fire once SCE learned fire agencies are investigating whether SCE equipment was involved in the ignition, which is a triggering event for reporting. SCE noted that the fire was reported at approximately 10:10 p.m. on Jan. 7, and preliminary information reflects the Eagle Rock – Sylmar 220 kV circuit experienced a relay at 10:11 p.m. A downed powerline was discovered at a tower associated with the Eagle Rock – Sylmar 220 kV circuit. SCE does not know whether the damage observed occurred before or after the start of the fire.

148. On January 13, 2025, shortly after the market opened, several lawsuits were filed in Los Angeles Superior Court on behalf of Eaton fire victims, alleging that Edison was responsible of the Eaton fire. The complaints included eye-witness

accounts and photographs that showed the fire was started by Edison's electrical equipment. A January 13, 2025 article by *Reuters* reported:

> Southern California Edison, a unit of utility Edison International (EIX.N), was hit by multiple lawsuits on Monday claiming its electrical equipment started one of the major wildfires currently raging in the Los Angeles area, according to court filings.
>
> * * *
>
> The suits cited multiple eyewitness accounts and images that appeared to show a fire at the base of a transmission tower owned by Southern California Edison (SCE) before powerful Santa Ana wind gusts quickly spread the flames.
>
> * * *
>
> The lawsuits say Edison infrastructure in the area was still energized at the time of the fire.

149. As a direct result of these disclosures, Edison's share price dropped $7.73 per share, or approximately 11.9%, from a closing of $65.00 per share on January 10, 2025 to a closing of $57.27 per share on January 13, 2025, the next trading day.

150. The new, Company-specific, material information released January 10-13, 2025, was directly related to the false and/or misleading statements previously made by the Defendants. However, Edison's stock price remained inflated as Defendants' misconduct continued to be concealed from investors.

**January 29, 2025 Disclosure**

151. On January 29, 2025, after the market closed for trading, *Reuters* published an article titled "Exposed utility wires may have contributed to LA's Eaton Fire, law firm says." The article stated:

> A law firm representing victims of the Eaton Fire in Los Angeles has submitted photos with a legal filing on Wednesday that appear to

show exposed wire at the base of a Southern California Edison tower that the firm alleges may have contributed to the deadly blaze.

The Eaton Fire was among the biggest of multiple wildfires that erupted on Jan. 7 and spread quickly in powerful Santa Ana Winds across the Los Angeles area. The wildfires are potentially the most costly disaster in U.S. history.

Photographs and video show sparks or flames near the utility's transmission equipment have already been submitted in court cases against SCE, but the new images may be the first to show burnt and exposed, or unburied, wire.

During potential arcing at the transmission towers, the exposed wires leading up to the bottom of the infrastructure may have heated to the point of igniting nearby vegetation, said plaintiff's attorney Alexander Robertson.

The arcing could have sent a shower of sparks and molten metal down to the ground, triggering a fire, the law firm said.

"The exposed grounding wire is charred on the photos and likely acted like a wick on a candle to ignite the brush at the base of the tower," attorney Robertson said.

"We don't yet know if this was the sole or contributing ignition source, but the physical evidence suggests it was at least a contributing cause," said Robertson.

152. The *Reuters* article further noted that "[a]n SCE spokesperson criticized law firms for sharing details, such as potential evidence, with the media 'when they should be sharing the information with authorities.'" The article also stated: "Earlier in the week, SCE said a preliminary review of its data for transmission lines that run through towers, including the one scrutinized by Robertson, showed no indication of faults on the lines until more than an hour after the reported start time of the blaze."

153. As a direct result of this disclosure, Edison's share price dropped over 3%, from a closing of $55.80 per share on January 29, 2025 to a closing of $54.06 per share on January 30, 2025, the next trading day.

154. The new, Company-specific, material information released January 29, 2025, was directly related to the false and/or misleading statements previously made by the Defendants. However, Edison's stock price remained inflated as Defendants' misconduct continued to be concealed from investors.

**February 3, 2025 Disclosure**

155. On February 3, 2025, after the market opened for trading, S&P Global Ratings – a division of S&P Global, a company that provides credit ratings used by investors and other stakeholders to assess the level of risk associated with investing – revised its outlook for Edison and SCE from stable to negative, as a result of potential losses from the Eaton fire. In a release titled, "Research Update: Edison International And Subsidiary SoCalEdison Outlooks Revised To Negative From Stable On Potential Risk For WildFire Fund Depletion: Rating Affirmed," S&P Global Rating stated:

> [T]he uncertainty that the California wildfire fund could materially deplete given the number and value of the structures that have been damaged or destroyed (over 10,000) due to the Eaton fire, and the possibility that SCE's equipment may be linked to the fire. The negative outlooks also reflect potential for a more challenging operating environment going forward for Edison and SCE due to wildfire risk, which could weaken credit quality.

156. As a direct result of this news, Edison's share price dropped close to 3%, from a closing of $54.00 per share on January 31, 2025 to a closing of $52.44 per share on February 3, 2025, the next trading day.

157. The new, Company-specific, material information released February 3, 2025, was directly related to the false and/or misleading statements previously made

by the Defendants. However, Edison's stock price remained inflated as Defendants' misconduct continued to be concealed from investors.

**February 6, 2025 Disclosure**

158. On the morning of February 6, 2025, Edison publicly filed an Eaton fire update with the CPUC that provided new details on the fire. Edison disclosed that it found evidence of potential arching and other damage on grounding equipment for two of the three inactive (idle) transmission lines at a tower near the suspected origin of the Eaton fire. Edison disclosed that it was investigating whether these idle transmission lines could have become energized, and the extent to which the lines or their grounding could be related to the cause of the Eaton fire. The letter stated that Edison was taking immediate steps to strengthen and standardize its grounding practices for idle lines.

159. On February 6, 2025, during market trading hours, Edison issued a press release stating that it submitted the Eaton fire update to the CPUC, as well as an update on the Hurst fire. With regard to the Eaton fire, the release stated:

> SCE notes that the cause of the fire's ignition has not been determined, and its investigation is ongoing. Information and data have come to light, such as videos from external parties of the fire's early stages, suggesting a possible link to SCE's equipment, which the company takes seriously. SCE has not identified typical or obvious indications that would support this association, such as broken conductors, fresh arc marks in the preliminary origin area, or evidence of faults on the energized lines running through that area.

160. With regard to the Hurst fire, Edison stated: "SCE states that the Los Angeles Fire Department is investigating the fire and has suggested SCE's equipment caused the Hurst Fire. . . . SCE believes its equipment may be associated with the ignition of the Hurst Fire."

161. On the same day, the *Wall Street Journal* published an article titled "Edison Unit Says Its Equipment May Have Been Involved in SoCal Fires." The report stated:

> Southern California Edison on Thursday submitted two letters to the California Public Utilities Commission with updates on its analysis of the Eaton and Hurst wildfires, saying it believes its equipment may be associated with the start of the Hurst fire.
>
> Information and data, including videos from external parties, also suggest that the Edison unit's equipment was involved in the Eaton fire, though the unit hasn't found any typical indications, such as broken conductors, that would support such a link, the company said.

162. As a direct result of these disclosures, Edison's share price dropped $1.28 per share, or approximately 2.5%, from a closing of $52.44 per share on February 5, 2025 to a closing of $51.15 per share on February 6, 2025, the next trading day.

163. The new, Company-specific, material information released February 6, 2025, was directly related to the false and/or misleading statements previously made by the Defendants. However, Edison's stock price remained inflated as Defendants' misconduct continued to be concealed from investors.

**February 13-14, 2025 Disclosures**

164. On February 13, 2025, before the market opened for trading, the *Los Angeles Times* published an article titled "Edison knew before Eaton fire that power cuts posed risk, records show." The *Los Angeles Times* reported that Edison "had been warned less than three years ago about the risk that a power shutdown would overload other transmission lines, potentially causing dangerous overheating and sparks." The article further reported that despite these warnings, SCE delayed a critical $17.3-million project to upgrade the transmission lines, which could have mitigated the risk of a power surge. The article cited to statements from various

industry experts on the issues and included detailed denials by Edison's spokesperson on the factual issues raised in the article.

165. On February 14, 2025, Edison posted a full denial of the *Los Angeles Times* article's allegations on its website titled "Correcting Misinformation in the LA Times."

166. On February 14, 2025, the *Los Angeles Times* republished the February 13, 2025 article under the title "Edison knew that cutting power was fire risk; Records show utility was told in 2022 that emergency shutdown could overload lines."

167. Also on February 14, 2025, Morgan Stanley issued a report before the market opened for trading, titled "Fire Risk Deep Dive: Too Much Risk for Investors to Bear." The reported stated:

> ***The California wildfire fund is no longer likely to be large enough to support utility financial health***. We estimate the damages from the Eaton fire could result in payouts of up to $13.5b, a large proportion of the $21b fund. If our estimates are accurate, the fund can no longer support another catastrophic fire at the level of the Eaton damages, leaving CA utility shareholders exposed to open-ended liabilities from the next Eaton-sized fire, with no cap available if a utility is imprudent (a regulatory term, *i.e.*, did not manage the electric system in a reasonable way). If a CA utility is judged to have been responsible for another Eaton-sized fire, there could be severe financial liability to shareholders.
>
> * * *
>
> We are moving our EIX PT to $48 (from $71), representing a 52% discount.

168. As a direct result of these disclosures, Edison's share price dropped 5% over February 13-14, 2025, from a closing of $52.68 per share on February 12, 2025 to a closing of $50.06 per share on February 14, 2025.

169. The new, Company-specific, material information released February 13-14, 2025, was directly related to the false and/or misleading statements previously made by the Defendants. However, Edison's stock price remained inflated as Defendants' misconduct continued to be concealed from investors.

**April 29, 2025 Disclosure**

170. On April 29, 2025, after the market closed for trading, Defendants held an earnings call with investors to discuss the Company's Q1 2025 results. During the call Pizarro reported on the Eaton fire, stating:

> While SCE has not conclusively determined that its equipment was associated with the admission of the Eaton fire. It is also not aware of evidence conclusively pointing to another source of [ignition]. ***Absent additional evidence SCE believes that its equipment could have been associated with the [ignition] of the Eaton fire***.
>
> ***As such, and in light of pending litigation, it is probable that EIX and SCE will incur material losses in connection with the Eaton Fire***.

171. Pizarro further stated on the conference call:

> There's certainly a lot of number of pieces of call it circumstantial facts. But importantly, we also are not finding another likely hypothesis for the [cause] of the fire. . . . [W]hen you combine those two elements, it felt appropriate to, in this quarter, make the disclosure about this being a probable event.

172. On the same day the Company filed its Form 10-Q for Q1 2025. With regard to the Eaton fire, the Form 10-Q stated:

> As of April 29, 2025, based on the information it has reviewed, SCE has not conclusively determined that its equipment was associated with the ignition of the Eaton Fire. SCE is also not aware of evidence conclusively pointing to another possible source of ignition. Absent

additional evidence, SCE believes that its equipment could have been associated with the ignition of the Eaton Fire and, in light of pending litigation, that it is probable that Edison International and SCE will incur material losses in connection with the Eaton Fire.

173. The market responded negatively to this new material Company-specific information. On April 29, 2025, J.P. Morgan issued a report titled "Eaton Fire 'Probable' Material Loss Expectations Outlined in a Negative Update." In the report, J.P. Morgan noted: "[W]e see the update as somewhat of a surprise and nonetheless shining a spotlight on the associated challenges of clearing [Edison's] path forward. As a result, we expect the material loss comments to be the [dominant] near-term driver in post-earnings trading." On April 30, 2025, the *Los Angeles Times* reported that Edison's material loss comments "are the clearest signal to date that the company is likely to sustain substantial losses from the devastating [Eaton] wildfire." On April 30, 2025, *Seeking Alpha* reported that the price of Edison shares closed down "in Wednesday's trading after CEO Pedro Pizarro said the company likely will suffer 'material losses' related to January's Eaton fire in California, which killed 18 people and destroyed thousands of homes and other structures while burning more than 14,000 acres."

174. As a direct result of Edison's April 29, 2025 disclosure, Edison's share price dropped $5.22 per share, or approximately 8.9%, from a closing of $58.73 per share on April 29, 2025 to a closing of $53.51 per share on April 30, 2025, the next trading day.

175. In sum, Edison's significant stock price declines described herein removed the artificial inflation from the price of Edison common stock. The declines in the price of Edison common stock described herein were a direct result of the nature, extent, and impact of Defendants' prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price declines of Edison common stock negates any inference that the losses

suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD ON THE MARKET DOCTRINE

176. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Edison common stock traded in an efficient market, were liquid and traded with moderate to heavy volume during the Class Period;
- Edison's common stock were traded on the NYSE and were covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and
- Lead Plaintiffs and members of the Class purchased, acquired, and/or sold Edison common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

177. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

178. Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class-Period statements in violation of a duty to disclose such information, as detailed above.

## IX. CLASS ACTION ALLEGATIONS

179. Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Edison common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants, officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

180. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Edison common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Edison or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

181. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

182. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

183. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of Edison;
- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;
- whether Defendants acted knowingly or with reckless disregard for the truth;
- whether the price of Edison common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

184. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

185. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

186. This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder. During the Class Period, Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that: (a) Defendants employed devices, schemes, and artifices to defraud; (b) Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) Defendants engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and the Class in connection with their purchase of Edison common stock during the Class Period.

187. In furtherance of their scheme and wrongful course of business, Defendants, and each of them, took the actions set forth herein.

188. During the Class Period, defendants Edison, SCE, Pizarro, and Rigatti engaged in a scheme and wrongful course of business and disseminated or approved the statements specified above, which they knew were false and misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants' misconduct was intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Edison common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Edison common stock at artificially inflated prices.

189. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of Edison common stock during the Class Period in that, in reliance on the integrity of the market, they paid artificially inflated prices for Edison common stock. Lead Plaintiffs and the Class would not have purchased Edison common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

Upon the disclosure that Defendants had been disseminating false and misleading statements to the investing public, Lead Plaintiffs and the other members of the Class suffered financial harm.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Edison and the Individual Defendants

190. Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

191. During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Edison and SCE, and conducted and participated, directly and indirectly, in the conduct of Edison's and SCE's business affairs. The Individual Defendants exercised control over Edison's and SCE's operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

192. The Individual Defendants acted as controlling persons of Edison and SCE within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their senior management positions as officers and/or directors of Edison and SCE, their participation in and awareness of Edison's and SCE's operations, and their personal knowledge of the statements filed by Edison and SCE with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, Edison's and SCE's decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

193. In particular, as CEO and CFO, the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of Edison and SCE and, therefore, are presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control

environment giving rise to the securities violations alleged in Count I, and exercised that power.

194. Edison had the power to control and influence SCE and the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Edison had the power to influence and control, and did influence and control, directly or indirectly, the decision making of SCE and the Individual Defendants, including the content of their public statements.

195. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisitions of Edison common stock during the Class Period when the relevant truth was revealed.

196. By reason of the foregoing, Edison and the Individual Defendants violated §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Certifying this as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Lead Plaintiffs to serve as Class Representative and appointing Lead Counsel Robbins Geller Rudman & Dowd LLP to serve as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and other Class members and against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

DATED: June 16, 2025

ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ
LAURIE L. LARGENT
ROBERT R. HENSSLER JR.
MATTHEW I. ALPERT
KEVIN S. SCIARANI
EVELYN SANCHEZ GONZALEZ

s/ Laurie L. Largent
LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
ksciarani@rgrdlaw.com
egonzalez@rgrdlaw.com

Lead Counsel for Lead Plaintiffs