O

# United States District Court
# Central District of California

| | |
|---|---|
| DOUGLAS ELLIOTT et al., | Case № 2:25-cv-01383-ODW (DFMx) |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS [48]** |
| EDISON INTERNATIONAL et al., | |
| Defendants. | |

## I.   INTRODUCTION

Several purchasers of Defendant Edison International's common stock bring this putative securities class action against Edison, its subsidiary Southern California Edison ("SCE"), and two Edison officers, Pedro J. Pizarro and Maria Rigatti. (Consol. Compl. ("Compl."), Dkt. No. 42.)  Defendants now move to dismiss the Consolidated Complaint. (Mot. Dismiss, Dkt. No. 48.)  For the following reasons, the Court **GRANTS** the Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND[2]

SCE is a public electric utility that delivers power to fifteen million people across Southern California. (Compl. ¶ 9.) Its parent holding company, Edison, trades on the New York Stock Exchange ("NYSE") under the ticker symbol "EIX." (*Id.* ¶ 8.) Pizarro is Edison's President and CEO. (*Id.* ¶ 10.) He also sits on both Edison's and SCE's Boards of Directors. (*Id.* ¶ 10.) Rigatti is Edison's Executive Vice President and CFO. (*Id.* ¶ 11.)

### A. Public Safety Power Shutoffs

In January 2019, nonparty Pacific Gas & Electric ("PG&E"), one of SCE's peer utilities, filed for bankruptcy due to liabilities stemming from wildfires in 2017 and 2018. (*Id.* ¶ 19.) Edison was also feeling the heat: in December 2017 and November 2018, two wildfires caused by SCE equipment ravaged Santa Barbara County and Malibu, respectively, opening Edison to numerous wildfire-related claims. (*See id.*)

In response to these wildfires and the increasing strain of California's public electric utilities, in July 2019, California passed Assembly Bills 1054 and 111 (the "Wildfire Bills"). (*Id.* ¶ 21.) The Wildfire Bills required public utilities such as SCE to improve wildfire safety in exchange for financial protection from wildfire-related losses. (*Id.*) Specifically, the Wildfire Bills created a $21 billion insurance fund that utilities may access if their equipment causes destructive wildfires. (*Id.*) However, the Wildfire Bills required utilities to invest in wildfire mitigation and improve safety culture. (*Id.* ¶ 23.) If a utility fails to take reasonable steps to reduce wildfire risks, such as clearing vegetation, hardening power lines, and shutting off power during red flag conditions, it must reimburse the insurance fund. (*Id.* ¶ 22.)

One of SCE's steps to prevent wildfires was to continue to improve and implement its Public Safety Power Shutoff ("PSPS") program. First authorized in 2012,

---

[2] All factual references derive from the Consolidated Complaint unless otherwise noted. Plaintiffs' well-pleaded factual allegations are accepted as true for purposes of resolving the Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

PSPS is a last-resort safety measure that allows utilities to shut-off power to a transmission line experiencing extreme weather and fuel conditions. (*Id.* ¶¶ 29–30.) As high winds can cause active transmission lines to generate sparks or other potential igniters, utilities rely on PSPS to automatically shut off transmission lines when certain wind thresholds are met. (*Id.* ¶¶ 19, 30).

After the 2017 and 2018 wildfire seasons, SCE faced increasing criticism for overreliance on PSPS. (*Id.* ¶ 29.) While PSPS provides the highest level of fire protection, it also imposes significant hardship on customers because they are left without electricity and power. (*Id.*) Thus, SCE set out to reduce its reliance on PSPS while simultaneously improving its weather forecasting and grid monitoring services so that PSPS would activate only in the most extreme conditions. (*Id.* ¶ 28.)

**B.    Eaton Canyon and Sylmar Transmission Lines**

PSPS created additional risks that SCE failed to disclose to the public. From 2021 to 2022, the California Independent System Operator ("CAISO"), California's independent transmission grid operator, performed a study on SCE's transmission equipment to analyze the impacts of PSPS. (*Id.* ¶¶ 40–41.) Specifically, CAISO focused on the potential risks of PSPS and whether de-energizing certain transmission lines could impact other transmission lines. (*Id.* ¶ 42.)

CAISO found that utilizing PSPS to cut power to certain SCE transmission lines could not only leave customers without power but also potentially overload other parts of the electrical grid. (*Id.*) Specifically, de-energizing select transmission lines would force 900 to 1000 megawatts of electricity to re-route to other transmission lines. (*Id.*) That sudden surge could cause those other lines to overheat, potentially sparking the very wildfires PSPS was designed to prevent or resulting in further power outages. (*Id.*)

Out of Edison's thirty-eight transmission lines running through high fire-threat districts, CAISO identified five that it believed should be excluded from PSPS due to overload risks. (*Id.* ¶ 44.) All five lines ran through Eaton Canyon or the Sylmar region. (*Id.*)

Plaintiffs allege that despite knowing of the above shortcomings in the Eaton Canyon and Sylmar transmission lines, SCE did not implement non-PSPS mitigation measures. (*Id.* ¶ 46.) SCE failed to harden the overhead transmission lines in Eaton Canyon and Sylmar or bury the transmission lines underground. (*Id.*) Instead, SCE's wildfire mitigation efforts for the Eaton Canyon and Sylmar transmission lines were essentially limited to inspections and vegetation management. (*Id.*)

**C.  PSPS Statements**

Defendants also continued to represent PSPS as a viable and critical wildfire mitigation tool. (*Id.* ¶ 49.) During a February 25, 2021 investor conference call, Pizarro stated that "SCE continues to improve [PSPS] with public safety being the paramount consideration." (*Id.* ¶ 85.) Defendants also touted PSPS as SCE's "foundational strategy for mitigating wildfire risk." (*Id.* ¶ 86.) In its FY 2020 Form 10-K, an annual report submitted publicly to the Securities and Exchange Commission ("SEC"), SCE stated that it uses PSPS "to proactively de-energize power lines to mitigate the risk of catastrophic wildfires during extreme weather events." (*Id.* ¶ 87.) During a July 28, 2022 investor conference call, Pizarro continued to describe PSPS as an important wildfire mitigation tool:

> [PSPS] provide[s] additional risk reduction that is critical during extreme weather and fuel conditions. SCE also continues to implement cutting-edge technologies to mitigate against high-impact wildfires.
>
> For example, the utility is leveraging machine learning to improve the accuracy of wind speed forecast at about 500 SCE weather station locations, and this will help better predict which areas may reach or exceed PSPS thresholds.

(*Id.* ¶ 94 (together with the statements at paragraphs 85 through 88, the "**PSPS Statements**").)

**D.  Risk Reduction Statements**

Defendants also started quantifying the reduced risk of losses from catastrophic wildfires that could be attributed to their wildfire mitigation plans, and to PSPS

specifically. (*Id.* ¶ 89.) Moody's RMS, a nonparty risk-management company, develops models to quantify the impact of wildfire risk mitigation efforts. (*Id.* ¶ 14 n.3.) Starting in 2021, Defendants began using Moody's RMS's North American Wildfire HD Model to assess SCE's percentage reduction in wildfire risk. (*Id.* ¶ 50.) SCE supplied Moody's RMS with copious data, including location of infrastructure, regional risk profiles, and ignition data. (*Id.* ¶ 51.) However, SCE did not provide Moody's RMS with CAISO's PSPS findings. (*Id.* ¶ 52.) Thus, Moody's RMS's model did not account for the increased wildfire risk resulting from the apparent unavailability of PSPS on the Eaton Canyon and Sylmar transmission lines. (*Id.*)

Although Moody's RMS's model relied on incomplete information, Defendants nevertheless publicized the Risk Reduction percentages generated by the model. (*Id.* ¶ 89.) On November 2, 2021, during an investor conference call, Pizarro reported the model's results and stated that SCE "estimates that it has reduced the probability of losses from catastrophic wildfires by 55% to 65% relative to pre-2018 levels." (*Id.*) Defendants also published these percentages in an accompanying slide presentation:

> **SCE estimates its wildfire mitigation and PSPS have reduced probability of losses from catastrophic wildfires by ~55-65%[1,2]**
>
> **Methodology**
> RMS, a leading provider of climate and natural disaster risk modeling, worked with SCE to analyze the benefits of SCE's wildfire mitigations
>
> The RMS wildfire model is designed to capture the full spectrum of wildfire threat
>
> Combined with SCE's mitigation effectiveness data, RMS quantified risk reduction from SCE's mitigations, including PSPS[3]
>
> SCE estimates PSPS currently accounts for ~40% of the reduction[2]
>
> **Substantial risk reduction due to SCE's mitigation measures**
>
> | | Pre-2018 | Now | Estimated Risk Reduction |
> |---|---|---|---|
> | Annual Risk of ≥$1.0 billion loss[4] | ~7.6% | ~3.2% | ~55% reduction in estimated probability of accessing the Wildfire Fund |
> | Risk of ≥$3.5 billion drawn from Fund over 3 years[4] | ~4.2% | ~1.5% | ~65% reduction in estimated probability of exceeding AB 1054 liability cap |
>
> **SCE expects to further reduce risk and decrease the need for PSPS with continued grid hardening investments**
>
> 1. Baseline risk estimated by Risk Management Solutions, Inc. (RMS) using its wildfire model, relying on the following data provided by SCE: the location of SCE's assets, reported ignitions from 2014–2020, mitigation effectiveness and locations of installed covered conductor, tree removals, inspections, line clearing, and PSPS de-energization criteria
> 2. There are risks inherent in the simulation analyses, models and predictions of SCE and RMS relating to the likelihood of and damage due to wildfires. As with any simulation analysis or model related to physical systems, particularly those with lower frequencies of occurrence and potentially high severity outcomes, the actual losses from catastrophic wildfire events may differ from the results of the simulation analyses and models of RMS and SCE. Range may vary for other loss thresholds
> 3. Includes 50,000 year-long simulations using 20 years of weather and fire modeling data weighted for the last 5 years to reflect recent experience and climate change impacts to date
> 4. Includes (i) total potential insured losses estimated by RMS, and (ii) total potential uninsured losses estimated by SCE based on management experience and consultation with insurance industry experts. "Fund" refers to CA AB 1054 Wildfire Insurance Fund. SCE used RMS loss estimates along with its estimates of uninsured losses to quantify the reductions in estimated probability
>
> November 2, 2021                 Energy for What's Ahead℠      6

(*Id.* ¶ 90; Decl. Lorraine L. Abdulahad ISO Mot. ("Abdulahad Decl.") Ex. 4 ("Q3 2021 Presentation") 6, Dkt. No. 50-4.)

Over the next three years, Defendants continued to report percentages in risk reduction generated by the Moody's RMS model. (*See* Compl. ¶¶ 91–93, 95–106 (together with paragraphs 89 and 90, the "**Risk Reduction Statements**").) By October 29, 2024, Defendants reported that SCE had reduced the probability of wildfire losses exceeding $1 billion by approximately 85%. (*Id.* ¶ 106.)

E.  **January 2025 Southern California Wildfires**

On January 3, 2025, the National Weather Service ("NWS") warned of extreme weather conditions beginning January 7, 2025, through January 10, 2025. (*Id.* ¶ 64.) SCE's own meteorologists also identified the potential for dangerous fire-weather conditions. (*Id.* ¶ 63.) By January 6, 2025, the NWS issued warnings of a "potentially dangerous situation" for regions including Eaton Canyon and Sylmar. (*Id.* ¶¶ 15, 65.)

Early on the morning of January 7, 2025, Whisker Labs, Inc., a nonparty electrical fault monitoring company, detected two faults on Edison's grid near Eaton Canyon. (*See id.* ¶ 67.) By this point, Southern California was experiencing sustained winds exceeding sixty miles per hour, with gusts up to seventy-nine miles per hour, well above the PSPS threshold for shutting off power. (*Id.*) However, power continued to flow through Edison's Eaton Canyon transmission lines. (*Id.*) By late afternoon on January 7, winds near Eaton Canyon reached speeds as high as ninety-nine miles per hour, far beyond PSPS guidelines. (*Id.* ¶ 69.) Still, power continued to flow through transmission lines. (*Id.*)

At 6:11 p.m., surveillance footage from a nearby gas station captured sparks flashing from Edison's overhead transmission lines in Eaton Canyon. (*Id.* ¶ 70.) Within minutes, flames appeared from the area beneath the transmission towers, marking the start of the Eaton Fire. (*Id.*) Over the next twenty-four days, the Eaton Fire ravaged parts of the City of Altadena. (*Id.*) By the time the Eaton Fire was extinguished, it had burned over 14,000 acres, destroyed 9,418 structures, killed 17 people, and caused

between $8 billion and $17.5 billion in damage. (*Id.* ¶ 79.) A separate fire started in Sylmar under SCE's downed transmission equipment. (*Id.* ¶ 81.) Later named the Sylmar Fire, it burned 800 acres and damaged two structures. (*Id.*)

On January 8, 2025, as the fires continued to rage, Edison's share price dropped 10.2%, from $77.38 per share to $69.50 per share, amid speculation that SCE's equipment may have played a role in the Eaton fire. (*Id.* ¶¶ 135–36.) Although Edison and SCE initially denied responsibility, by February 6, 2025, both companies began acknowledging evidence indicating that their transmission lines were responsible for the Eaton and Sylmar fires. (*See id.* ¶ 78.) By that point, Edison's share price had dropped to $51.15 per share, representing a 33.9% decrease from where it was trading before the fires. (*Id.* ¶¶ 136, 162.)

### F. Procedural History

On February 19, 2025, Plaintiff Douglas Elliott brought this putative securities class action against Defendants. (Elliott Compl., Dkt. No. 1.) On May 12, 2025, the Court appointed three Hawaii Sheet Metal Workers funds as lead plaintiffs and the law firm Robbins Geller Rudman & Dowd LLC as lead counsel. (Order Appointing Lead Pls. & Counsel, Dkt. No. 30.) On June 16, 2025, Plaintiffs filed the Consolidated Complaint, asserting two causes of action: (1) violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") against all Defendants; and (2) violation of Section 20(a) of the Exchange Act against Edison, Pizarro, and Rigatti. (Compl. ¶¶ 185–96.) Plaintiffs seek to represent all those similarly situated individuals who purchased or otherwise acquired Edison common stock between February 25, 2021, through April 29, 2025. (*Id.* ¶¶ 1, 279.) Defendants now move to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Mot.)

### III. LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable theory or insufficient facts pleaded to support an otherwise cognizable theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a

motion to dismiss, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 482, 494 (9th Cir. 2003). The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Stated differently, the complaint must "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Determining whether a complaint states a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court limits its review to the pleadings and must construe all factual allegations in the complaint "as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, or unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Plaintiffs alleging violations of securities laws must meet not only Rule 8(a)'s pleading requirements but also the "dual pleading requirements of [Rule] 9(b) and the [Private Securities Litigation Reform Act ('PSLRA')]." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Under Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Allegations must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993). The Ninth Circuit requires parties to plead "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Furthermore, under the PSLRA, a securities fraud plaintiff must plead (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) if the "allegation regarding the statement or

omission is made on information and belief," all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1); *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000).

## IV. REQUEST FOR JUDICIAL NOTICE

District courts generally may not consider evidence outside of the pleadings when ruling on a motion to dismiss under Rule 12(b)(6). *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). However, a court may consider evidence outside of the pleadings if it is properly subject to judicial notice or is incorporated by reference into the pleadings. *Lee*, 250 F.3d at 689. Relevant here, the Court may properly take judicial notice of SEC filings, as they are "public disclosure documents required by law to be filed." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998) (taking judicial notice of SEC filings, even those "not specifically mentioned" in the complaint).

Courts may also consider material incorporated by reference into the complaint as true for purposes of a motion to dismiss under Rule 12(b)(6) where the plaintiff refers to the material extensively or it forms the basis of the plaintiff's claims. *Ritchie*, 342 F.3d at 908; *see also In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1159 (C.D. Cal. 2007) (taking judicial notice of a document where security fraud plaintiffs' claims were "predicated upon" the document).

Defendants request the Court to take judicial notice of, or incorporate by reference, a number of SEC filings, press releases, and transcripts. (Req. Judicial Notice ISO Mot. ("RJN"), Dkt. No. 49.) Plaintiffs object to some, but not all, of Defendants' requests. (*See generally* Opp'n RJN, Dkt. No. 52.) Specifically, Plaintiffs "do not object to the Court's consideration of Exhibits 1–7." (*Id.* at 14.) In resolving this Motion, the Court relies only on Exhibits 1 through 7, in addition to the allegations in the Consolidated Complaint. The remaining proffered exhibits are not material to the Court's resolution. Thus, the Court **GRANTS IN PART** Defendants' Request for Judicial Notice, takes judicial notice of Exhibits 1 through 7, and **DENIES** the balance

of Defendants' Request. (Dkt. No. 49); *see Migliori v. Boeing N. Am. Inc.*, 97 F. Supp. 2d 1001, 1003 n.1 (C.D. Cal. 2000) (declining to take judicial notice of exhibits that "do not affect the outcome of" the motion).

## V.   DISCUSSION

Plaintiffs assert their first cause of action under Section 10(b) of the Exchange Act. (Compl. ¶¶ 185–96.) Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to this section, the SEC promulgated Rule 10(b)-5, which makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit or state a material fact necessary in order to make the statements made . . . not misleading; or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

"The elements that must be pleaded to state a claim for securities fraud are strenuous but well established." *Curry v. Yelp, Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). A plaintiff must plead and prove the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Defendants argue that Plaintiffs fail to plead falsity of the alleged misrepresentation or omission, scienter, and loss causation. (*See generally* Mot.) The Court finds "the issue of falsity to be dispositive, and [it] therefore do[es] not reach the

issues of scienter or loss causation with respect to" the Consolidated Complaint. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021).

**A.     PSPS Statements**

Plaintiffs allege that the PSPS Statements are materially misleading. (Compl. ¶ 107(a).) Plaintiffs assert that the PSPS Statements were false and misleading when Defendants made them because Defendants knew PSPS was unavailable on the Eaton Canyon and Sylmar transmission lines, increasing the risk of wildfires in those areas. (*Id.*) Defendants argue that the PSPS Statements are not actionable. (Mot. 15.) Specifically, they contend that these statements are too vague and were not false or misleading when made. (*Id.*)

"[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citation modified). A "mildly optimistic, subjective assessment hardly amounts to a securities violation." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). By contrast, a statement "capable of objective verification . . . can constitute [a] material misrepresentation[]." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

Here, the PSPS Statements are incapable of objective verification and are too vague to induce a reasonable investor's reliance. In the PSPS Statements, Defendants vaguely described PSPS as one of many tools that it uses to combat the risk of wildfire. For example, Defendants used positive phrases that attributed importance to PSPS, stating that they "continue[d] to improve" PSPS, they used PSPS "proactively," and PSPS was "critical." (Compl. ¶¶ 85, 87, 94.) Defendants also stated that PSPS was a "foundational strategy for mitigating wildfire risk." (*Id.* ¶ 86.) Such statements amount to generalized corporate optimism rather than concrete representations. As encouraging as the PSPS Statements may have been, and as tragic they may seem considering

devastating fires to come, they contain no verifiable measure by which a factfinder could determine their falsity.

Plaintiffs' falsity theory illustrates its deficiency. The crux of Plaintiffs' falsity theory is that the PSPS Statements are false and misleading because Defendants could not use PSPS on the Eaton Canyon and Sylmar transmission lines. (*Id.* ¶ 107(a); *see also id.* ¶ 49 ("[I]n their public disclosures, Defendants continued to represent PSPS as a viable, and critical, wildfire mitigation tool for all transmission lines.").) Under this theory, however, one would expect the PSPS Statements to at least suggest that PSPS was available in Eaton Canyon or Sylmar. Critically though, Plaintiffs fail to identify any statement containing a concrete assertion that PSPS could be consistently utilized at every transmission line, or at Eaton Canyon or Sylmar, specifically. Had Defendants claimed that it could deploy PSPS across *all* their transmission lines, a factfinder could readily determine that such a claim is false if they found that PSPS was unavailable in Easton Canyon or Sylmar. However, nothing about the "foundational strategy" statement, nor the other PSPS Statements, contain such specific information that a factfinder could find verifiably false.

If anything, the PSPS Statements, read charitably for Plaintiffs, plainly indicate that PSPS was not perfect. For example, Pizarro stated that "SCE continues to improve" its PSPS operations, necessarily implying ongoing development rather than a perfected system. (*Id.* ¶ 85.) Pizarro also stated that SCE was utilizing machine learning to improve its usage of PSPS, further demonstrating that PSPS was still a work in progress. (*Id.* ¶ 94.) At best for Plaintiffs, the PSPS Statements would lead a reasonable investor to believe that Defendants' PSPS operations were strong, but not perfect. At worst for Plaintiffs, the PSPS Statements would lead a reasonable investor to conclude that PSPS was a work in progress. However, neither inference supports Plaintiffs' falsity theory, that a reasonable investor would read or hear the PSPS Statements to mean that PSPS was available at every SCE transmission site, including Eaton Canyon and Sylmar.

1  In their opposition brief, Plaintiffs appear to pivot from a misrepresentation theory to an omission theory.  (Opp'n 11, Dkt. No. 51 ("By *omitting* the PSPS deficiencies identified in the CAISO study . . . .").)  As an initial matter, Plaintiffs do not plead this theory with particularity in the Consolidated Complaint, and thus, the Court may decline to consider it.  *See* 15 U.S.C. § 78u-4(b)(1) (requiring a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading"); *In re Fastly, Inc. Sec. Litig.*, 801 F. Supp. 3d 880, 909 (N.D. Cal. 2025) (declining to consider a theory of falsity not alleged in the operative complaint).  But even if Plaintiffs had properly pleaded an omission theory, it would falter under the alleged facts.

Under an omission theory, the challenged statements must have "create[d] an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  There must also be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 38 (2011) (citation modified).  Thus, an omission is not false under Rule 10b-5 if it is merely incomplete as opposed to substantially misleading.  *See Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("We have expressly declined to require a rule of completeness for securities disclosures.").

As the Court discusses above, the PSPS Statements do not leave an impression substantially different from reality.  Defendants stated that they were improving PSPS and that PSPS was an important part of their wildfire strategy.  They do not state that PSPS operations were flawless or universally available.  Defendants even disclosed that there were certain risks involved with utilizing PSPS, including "restrictions that would limit SCE's ability to implement [PSPS] when conditions warrant or would otherwise limit SCE's operational practices relative to wildfire risk mitigation." (Abdulahad Decl. Ex. 5 ("FY 2022 Presentation") 1, Dkt. No. 50-5.)  In light of these risk disclosures, a

13

reasonable investor reading the PSPS Statements would not conclude that PSPS could be deployed at every transmission line. Thus, if Defendants had disclosed the fact that PSPS could not be used on five of SCE's thirty-eight transmission lines, including Eaton Canyon and Sylmar, a reasonable investor would not find this fact as "significantly alter[ing] the total mix of information made available." *Matrixx*, 563 U.S. at 38.

For these reasons, the Court finds that the PSPS Statements are inactionable as a matter of law.

**B.  Risk Reduction Statements**

Plaintiffs also allege that the Risk Reduction Statements are false and misleading because they do not account for the PSPS deficiencies at Eaton Canyon and Sylmar. (*Id.* ¶ 107(b).) Defendants argue, among other things, that the Risk Reduction Statements are inactionable opinions. (Mot. 13–14.) Plaintiffs concede that the estimated probabilities are opinions; they instead argue that the opinions are nevertheless actionable. (Opp'n 6–7.) Thus, the Court proceeds on the premise that the Risk Reduction Statements are opinions. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("[Courts] rely on the parties to frame the issues for decision.").

Under Rule 10b-5, both the affirmative misrepresentation and fraudulent omission theories "require falsity with respect to a material fact." *Wochos*, 985 F.3d at 1188–89 (citation modified). Thus, "there are substantial limits in applying such theories to a pure statement of honest *opinion*." *Id.* (emphasis in original). However, the Supreme Court has identified three circumstances in which a statement of opinion may be actionable. *See Omincare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 194 (2015). The Ninth Circuit summarizes them as follows:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the

> supporting fact the speaker supplied is untrue. Third, when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (citation modified) (citing *Omnicare*, 575 U.S. at 186, 194.)

The first two circumstances do not apply here. First, Plaintiffs do not allege that Defendants did not truly hold the belief that the Risk Reduction Statements were untrue. (*See generally* Compl.; *see also* Opp'n 6–7.) Second, Plaintiffs do not allege, or argue, that the Risk Reduction Statements embed statements of fact. (*See generally* Compl.; *see also* Opp'n 6–7.)

This leaves the third circumstance, pleading an actionable opinion based on a misleading omission. For an opinion to be misleading by omission, "(1) the statement must omit material facts about the defendant's inquiry into or knowledge concerning a statement of opinion, and (2) those facts must conflict with what a reasonable investor would take from the statement itself." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (citation modified) (quoting *Dearborn Heights*, 856 F.3d at 615). For example, "if a company declares that 'we believe our conduct is lawful,' a reasonable investor likely expects such an assertion to rest on some meaningful legal inquiry, but if in fact that company made that statement without having consulted a lawyer, the statement could be misleadingly incomplete." *Wochos*, 985 F.3d at 1189 (citing *Omnicare*, 575 U.S. at 188).

A reasonable investor could draw several impressions from the Risk Reduction Statements. A reasonable investor might understand them to mean that PSPS and SCE's other wildfire-mitigation techniques are reducing the risk of losses from catastrophic wildfires. A reasonable investor might infer that PSPS, while not perfect, remains an

important wildfire-mitigation tool. A reasonable investor might even conclude that Defendants could deploy PSPS on most of SCE's transmission lines.

However, the Risk Reduction Statements would not lead a reasonable investor to believe that PSPS was available on all thirty-eight of SCE's transmission lines, including Eaton Canyon and Sylmar. The Risk Reduction Statements are all they are: probabilities. By their very nature, probabilities and estimates invite a certain level of uncertainty and qualification. The qualification here is that PSPS was not perfect and that it did not completely reduce risk of loss from wildfires. Without an assertion of perfect or complete loss-reduction through PSPS, it would be illogical for reasonable investor to assume that SCE could use PSPS on all thirty-eight of their transmission lines. This is particularly so in light of Defendants' disclaimers that certain circumstances could limit the availability of PSPS. (*See, e.g.*, FY 2022 Presentation 1.) Thus, even accepting as true that Defendants failed to include their inability to use PSPS in five of thirty-eight transmission lines in the Moody's RMS model, Plaintiffs fail to show that such a fact "conflict[s] with what a reasonable investor would take from the" Risk Reduction Statements. *In re Atossa Genetics*, 868 F.3d at 802.

For these reasons, the Court finds that Plaintiffs fail to plead falsity with respect to either the PSPS Statements or the Risk Reduction Statements. Thus, Plaintiffs fail to state a claim on their Section 10(b) cause of action. Without a primary violation, Plaintiffs' Section 20(a) claim necessarily fails. *See Dearborn Heights*, 856 F.3d at 623 (affirming dismissal of a Section 20(a) claim when plaintiff failed to sufficiently plead a Section 10(b) primary violation).

**C.   Leave to Amend**

Where a district court grants a motion to dismiss, it should generally provide leave to amend, unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly

cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Thus, leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

Here, the PSPS Statements cannot be saved by amendment. As explained above, the statements are too vague and lack concrete representations capable of establishing falsity. However, the Court finds that Plaintiffs could plausibly plead the Risk Reduction Statements under a separate opinion theory. Thus, the Court grants leave to amend the first and second causes of action, only to the extent they are premised on the Risk Reduction Statements.

## VI. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion to Dismiss. (Dkt. No. 48.) The Court grants Plaintiffs **LEAVE TO AMEND** the first and second causes of action only to the extent they are premised on the Risk Reduction Statements.

If Plaintiffs choose to amend, they must do so within **twenty-one (21) days** of the date of this Order, in which case, Defendants shall answer or otherwise respond no later than **fourteen (14) days** from the date of the filing of the amended complaint. If Plaintiffs choose not to amend, all causes of action shall be deemed dismissed with prejudice as of the lapsed deadline, and the Court will close the case.

**IT IS SO ORDERED.**

March 6, 2026

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**